**REINDERS BROTHERS, INC.,**
**Plaintiff-Appellee,**

**v.**

**RAIN BIRD EASTERN SALES CORPORATION, Defendant-Appellant.**

**No. 79–2251.**

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1980.

Decided July 30, 1980.

---

**46**

Clay R. Williams, Milwaukee, Wis., for defendant-appellant.

Bruce C. O'Neill, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, SPRECHER and CUDAHY, Circuit Judges.

CUMMINGS, Circuit Judge.

█ In this diversity case, defendant Rain Bird Eastern Sales Corp., a California-based manufacturer and supplier of turf and irrigation products, appeals from the district court's entry of a preliminary injunction in favor of plaintiff Reinders Bros., Inc., a Wisconsin seller of such products and since 1959 a Rain Bird distributor. Plaintiff originally filed suit in Wisconsin state court under the Wisconsin Fair Dealing Law (Wis.Stat.Ann. Ch. 135 *et seq.*) to enjoin defendant[1] from discontinuing plain-

---

1. Originally the complaint also named Irrigation, Inc. as a defendant. Irrigation is a Wisconsin distributor engaged by Rain Bird at the time it attempted to discontinue plaintiff as a dealer. Irrigation moved in state court to be dismissed from the action and renewed its argument in the successful removal motion filed by it and Rain Bird. After removal of the case

tiff as a dealer. Defendant removed the case to the district court for the Eastern District of Wisconsin where plaintiff pressed its request for a preliminary injunction to halt the attempted termination. On September 21, 1979, the district court ruled for plaintiff and directed it to submit proposed findings of fact and conclusions of law. After plaintiff complied, the court on October 18, 1979, filed a final order granting the preliminary injunction. Defendant filed its appeal to this Court the next day. Although we affirm the district court's orders in almost all respects, we nevertheless remand the case to the district court for the reason discussed below.

Rain Bird is the largest United States manufacturer of equipment and parts used in automatic irrigation and lawn sprinkler systems. Since at least 1959, Reinders Brothers has been distributing Rain Bird products in Wisconsin, acting during the last decade under a written dealership agreement with defendant. Between 1974 and 1978, when the present controversy arose, that agreement consisted of a contract entered into on an annual basis, permitting either party to terminate with or without cause upon ten days' notice. The agreement required plaintiff to undertake an "adequate and reasonable sales effort, in the active promotion of Rain Bird products" within a specified geographical area but did not grant plaintiff an exclusive dealership in that area (Rec. Item 10, Exh. A). There is in fact evidence in the record that two other Wisconsin dealers carry the complete Rain Bird line and as many as seventeen others carry up to 90 percent of the defendant's products (Tr. 154–155). Throughout the relevant period, Reinders sold a wide variety of lawn products and some sprinkler systems manufactured by other companies, and Rain Bird sprinkler systems apparently

accounted for no more than four percent of Reinders' total sales in any one year. Until 1978, defendant never expressed dissatisfaction with plaintiff's sales efforts.

In March 1978, Reinders completed its acquisition, begun several months earlier, of R & S Parts, Inc. R & S Parts had previously been a Reinders competitor in several product markets, including that for sprinkler systems, where it served as a distributor for the Toro Company. Toro is Rain Bird's major rival in the manufacture of irrigation and sprinkler systems. Before the acquisition, Reinders had sold Toro lawn products and upon acquisition of R & S, it successfully persuaded Toro to permit Reinders to assume R & S's role as a franchisee for Toro sprinkler and irrigation products.[2] The resulting dealership agreement between Reinders and Toro extended Reinders' distribution responsibilities from selling Toro lawn products to marketing Toro sprinkler products in a territorial area largely congruent with Reinders' territory for Rain Bird. A preliminary letter concluding the agreement between Toro and Reinders spoke simply of marketing goals and performance criteria for Reinders (Exh. 13), but Toro's standard contract calls upon its distributors to sell Toro products "aggressively by all legitimate means" and to "provide the necessary effort" to promote, demonstrate and sell Toro products and achieve "a reasonable share of market" (Exh. 10 at 4, 5).

After hearing of the Reinders-R & S negotiations, Rain Bird notified plaintiff that it had begun searching for a new distributor for its products. Its relationship with Reinders apparently deteriorated throughout 1978. In January 1979, defendant granted a dealership to Irrigation, Inc.[3] and at about the same time orally informed

to federal court, plaintiff voluntarily agreed to Irrigation's dismissal under Rule 41(a) of the Federal Rules of Civil Procedure (Record Item 7).

**2.** In the court below, defendant indicated that it would show that plaintiff agreed as part of the arrangement with Toro that it would discontinue carrying the products of Toro's competitors

(Record Item 16 at 4). Before this Court defendant has pointed to no evidence of such an agreement between plaintiff and Toro. Moreover, as discussed below, the formal contract between Toro and plaintiff expressly permits plaintiff to carry competing products.

**3.** See note 1 *supra*.

plaintiff that the latter's dealership was being terminated. During April and June 1979, Rain Bird renewed by written notice its efforts to terminate Reinders, citing alleged deficiencies in Reinders' sales performance as well as Reinders' disloyalty and alleged attempts to monopolize the turf sales market in Wisconsin.

In April 1979, plaintiff filed its complaint in Wisconsin state court, alleging that defendant's attempted termination of plaintiff violated Section 135.04 of the Wisconsin Statutes, which is part of the Wisconsin Fair Dealing Law (WFDL). In particular, plaintiff alleged that defendant did not have good cause for the termination, as required by the WFDL,[4] and that defendant had failed to meet the notice requirements of the statute. After plaintiff gained a temporary restraining order in state court, defendant removed the case to federal court in May 1979. Plaintiff there pressed its request for a preliminary injunction and, while the motion was pending, discovery commenced. Two incidents relevant to our consideration occurred during this discovery period. Immediately prior to the September hearing on the preliminary injunction motion, defendant twice attempted to depose Thomas Onasch, one of plaintiff's employees, but although Onasch appeared at the deposition, he refused to testify. Onasch did appear at the hearing although he was not called as a witness. Second, during the July deposition of Robert Emmerich, Toro's district manager, Emmerich refused to testify regarding certain Toro documents sought by defendant. Subsequently, defendant obtained a subpoena duces tecum for Emmerich to appear with the documents at the hearing. Upon motion of Emmerich, however, the district court summarily quashed the subpoena.

The district court conducted a hearing on the preliminary injunction motion over a three-day period in September 1979. On September 21, it ruled in favor of plaintiff, after expressly finding that plaintiff had met all four prerequisites of *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). In particular, Chief Judge Reynolds found that Rain Bird had discontinued Reinders solely "because the plaintiff acquired a competing dealership" (App. 7). Since, according to Judge Reynolds, the WFDL did apply to the dealership at issue and "[t]he acquisition of a distributorship of a competing manufacturer does not constitute good cause for termination within the meaning of the statute," he concluded that defendant had apparently violated the Wisconsin statute and that plaintiff had a reasonable likelihood of success on the merits (App. 8). Judge Reynolds also found that irreparable injury could be presumed under Section 135.065 of the WFDL (App. 8) and that the threatened injury to plaintiff in the prospective loss of 20 years' good will with its Rain Bird customers outweighed any harm to Rain Bird, which was free to contract with other distributors (App. 7, 8). Finally, the district court found that the Wisconsin legislature's statement of the purposes of the WFDL could serve as the requisite finding of the public interest served by the injunction (App. 8). The district court's order did not rule on or mention Rain Bird's request under Rule 65(c) of the Federal Rules of Civil Procedure for a bond to secure Rain Bird against any costs and damages should the issuance of the injunction ultimately prove improper.

*Standard of Review*

As the district court rightly noted, the granting of a preliminary injunction requires that the district court consider each of the four factors set forth in *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). Those factors are: (1) whether the plaintiff will have an adequate

---

4. The good cause provision of the statute actually appears in Section 135.03 and good cause itself is defined in Section 135.02(6). Plaintiff's complaint does not mention these Sections, relying instead on Section 135.04, which merely sets the requirements of notice under the stat-

ute. Ironically, the district court granted the preliminary injunction solely on the basis of the good cause requirements despite the lack of any mention of the appropriate Section in plaintiff's complaint.

remedy at law or will be irreparably harmed if the injunction does not issue; (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and (4) whether the granting of a preliminary injunction will disserve the public interest. Upon appeal, a district court decision that, as here, preserves the status quo may be overturned only upon a showing of a clear abuse of discretion. *Jordan v. Wolke*, 593 F.2d 772, 773 (7th Cir. 1978); *Banks v. Trainor*, 525 F.2d 837 (7th Cir. 1975), certiorari denied, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748. Reviewing the district court's decision requires a reexamination of his findings on each of the four considerations. Yet no one of the factors is decisive, even though the likelihood of success on the merits often serves as a threshold requirement for entitlement to preliminary relief. *Kolz v. Board of Education of the City of Chicago*, 576 F.2d 747, 748–749 (7th Cir. 1978). As a result, not only must the district court's findings be allowed to stand absent evidence that they are clearly erroneous or represent a certain mistake of law (*Sangmeister v. Woodard*, 565 F.2d 460, 464–465 (7th Cir. 1977), appeal dismissed *sub nom. Illinois State Board of Education v. Sangmeister*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535), but its decision as a whole must not be upset unless the totality of the factors points to a clear departure from the proper exercise of its discretion.

*Likelihood of Success on the Merits*

In considering the case on the merits, the district judge found that defendant terminated plaintiff for acquiring a competing dealership and that such a reason is invalid under the WFDL. Accordingly, he concluded that plaintiff had a reasonable likelihood of demonstrating that the termination should be permanently enjoined as a matter of Wisconsin law. Defendant disputes this conclusion on several grounds. First, defendant argues that the WFDL does not govern this case. The basis for this conclusion is that as originally enacted Section

135.03 of the Wisconsin Statutes, which requires that a grantor terminating a dealership have good cause, limited application of the statute to "a dealership agreement entered into after the effective date of the act," which was April 5, 1974. Since plaintiff and defendant have had a continuing relationship since 1959, defendant argues that its agreement with plaintiff was not covered. Moreover, although the Wisconsin legislature amended the Section in 1977 to delete the time restriction on applicability, defendant claims an exemption from the amendment's effect since, it argues, it did not enter into an agreement or renew an agreement with plaintiff after 1977 and application of the amendment to the continuing relationship between the parties would be unconstitutional as a burdensome, retroactive interference with an existing contractual relationship.

As noted earlier, between 1974 and 1978 plaintiff operated its dealership under a contract signed annually with defendant. Not only did that contract permit termination with or without cause on short notice, it provided no guarantee of a new contract for the following year. Furthermore, each contract bore the following caption: "This agreement cancels and supersedes any prior franchise agreement entered into by and between the parties hereto." It is therefore apparent that the parties described themselves as newly agreeing to the dealership arrangement each year and, since defendant admits that the statute applies to any agreement entered into after April 1974 (Br. 36), the WFDL governs. Even were this not the case, defendant also admits that the WFDL applies to any renewal of the agreement after November 23, 1977 (*id.*). As a result, the contract for 1978, even if construed as a renewal and not a new agreement, would fall within the statute. Defendant rejoins that it never signed the 1978 agreement. But even assuming its failure to sign would prevent operation of the renewal contract, defendant has not denied that the 1977 contract by its own terms terminated the relationship at the end of the calendar year,

that it continued to deal with plaintiff as a distributor throughout 1978, and that defendant attempted to terminate plaintiff in 1979. These factors point unequivocally to a renewal of the agreement between the parties at the outset of 1978, particularly since the statute covers all agreements "expressed or implied" (Section 135.02(2)).

Defendant insists that *Consumers Oil Corp. of Trenton v. Phillips Petroleum Co.,* 488 F.2d 816, 818 (3d Cir. 1973), forecloses the conclusion that the parties in this case had anything other than a continuing relationship. Nevertheless, as we read it, that case actually buttresses our conclusion that the WFDL applies. In *Consumers Oil Corp.* the parties drafted their agreement as a one-year contract that would continue automatically for an additional year unless one of the parties gave notice. The Third Circuit did find that the parties had a continuing relationship. But that conclusion did not prevent the court from concluding that the year-to-year conduct of the parties represented a sufficient act of renewal to bring the agreement within the range of the New Jersey Franchise Practices Act, despite the presence of effective date language similar to that at issue here. The court found the act of renewal in the acquiescence of the parties to the continuing relationship. It buttressed its conclusion, moreover, by noting that the comprehensive language of the state statute precluded any attempt to give it a hypertechnical reading, indicating instead that the desire of the legislature was to apply the statute as broadly as possible.

*A fortiori* in this case the statute should apply. The annual contracts between the parties expressly terminated the agreement at the end of the calendar year so that the parties could continue their relationship only through some affirmative conduct, such as the signing of a new contract or choosing to deal with one another on the usual terms. The act of renewal here was therefore at least as clear as that in *Consumers Oil Corp.* In addition, the language of the amendment and of the bill enacting it into law make plain the Wisconsin legislature's intent to reach as far as possible. At the same time, notwithstanding defendant's

assertion to the contrary at oral argument, none of the objections to application that the court in *H. Phillips Co. v. Brown-Forman Distillers Corp.,* 483 F.Supp. 1289 (W.D.Wis.1980), found on the facts of that case operate in this one. The parties in *H. Phillips* had no written agreement whatsoever. Whatever distributorship agreement they had—the existence of a dealership was itself gravely questioned by the district court—never took the form of a yearly contract and never required any affirmative conduct of renewal such as that required in this case. As a result, the court in *H. Phillips* foresaw serious retroactivity problems in applying the WFDL to the unformed, continuing relationship of the parties. In this case, the parties engaged in conduct of renewal in 1978, based on a relationship that had taken a specific form, sufficient to permit the WFDL to operate, even if applied only prospectively. As a result no constitutional objections exist in this case.

■ Defendant next challenges the district court's finding on the merits by attacking its conclusion that defendant terminated plaintiff for acquiring a competing dealership. Defendant asserts that although it terminated plaintiff after it acquired R & S Parts, defendant did so not because of that acquisition simply, but because of the divided loyalties and bad faith plaintiff exhibited by the acquisition and in its subsequent dealings with defendant. This argument represents little more than an invitation to relitigate the facts in this Court, an invitation we decline. It is worth noting only that the statute places the burden on defendant to prove that it had good cause for the termination. To this end, defendant inserted some evidence in the record to show that plaintiff's sales of Rain Bird products declined after it acquired R & S Parts. But there is also evidence that climatic conditions may have adversely affected sprinkler sales (Exh. 18), that plaintiff's sales of Toro products also were below what might have been expected (Tr. 108), and that plaintiff operated during 1978 under the cloud of defendant's continuing sug-

gestions that plaintiff would be terminated as a dealer as well as some unwillingness on defendant's part to provide assistance considered vital by plaintiff in its sales effort (Tr. 34). Further, there is evidence that defendant formed an intent to discontinue plaintiff well before the 1978 decline in plaintiff's sales of Rain Bird products became apparent (Tr. 33–34), thereby undermining any asserted link between plaintiff's post-acquisition conduct and defendant's decision to terminate.

■ Nor does the mere presence of a "best efforts" clause in both the Toro and Rain Bird dealership agreements by itself supply the necessary element of good cause. That the statute places the burden on defendant to prove *good cause* precludes any attempt to presume it from contractual language. Furthermore, Reinders' contract with Toro expressly permitted the distributor to carry competing lines and acknowledged that the manufacturer had no right to specify otherwise. Indeed, there is some doubt whether any other rule would be viable under the antitrust laws. As a result, the defendant's invocation of the "best efforts" clauses does not prove that plaintiff was unable to meet its contractual commitments. Defendant has therefore not demonstrated that the district court plainly erred in determining that plaintiff's 1978 sales efforts were not the cause of its termination and in concluding that plaintiff might well succeed in proving the absence of any reason for the termination meeting the statutory criteria. Defendant will of course have a fresh opportunity to prove its case upon plenary trial on the merits.

Under a separate caption in its brief, defendant has noted two irregularities in the discovery process below that bear on the district court's finding on the merits. In particular, defendant asserts that because Thomas Onasch, an employee of plaintiff, refused to appear for his deposition immediately before the hearing, and the district court, acting *ex parte*, granted Toro district manager Emmerich's motion to quash the subpoena for his presence at the hearing, the record below was incom-

plete and the district judge had engaged in an abuse of discretion in his handling of the proceedings. Neither contention warrants a different result in our conclusion about the merits or in our disposition of the case as a whole.

■ Thomas Onasch's refusal to testify at his deposition shortly before the hearing was based on his assertion that his preferred counsel was unavailable. Although defendant now avers that this ground was spurious, it did not present its argument to the court below. Rule 37 of the Federal Rules of Civil Procedure sets forth the procedure the party seeking the deposition is to follow in such cases. To compel testimony, the party must seek an order from the court by motion, in response to which the deponent's reasons may be heard, and only after the order is granted and violated, are sanctions permissible. Even if Onasch's behavior is understood as a constructive refusal to appear, Rule 37(d) permits the district court to impose sanctions only "on motion" and plainly contemplates that the allegedly refractory party will have an opportunity to explain his conduct. Since defendant's own failure to raise the issue with the district court prevented that court from ruling on the witness' action and potentially ordering the deposition to proceed, defendant has only itself to blame for any resulting deficiency in the record and cannot complain about the matter here. Similarly, defendant cannot argue that the handling of this issue below amounts to an abuse of discretion sufficient to overturn the district court's grant of the preliminary injunction. Defendant surely cannot charge the district court with such an error when defendant's own neglect prevented the district court from exercising any discretion whatsoever.

■ The quashing of the subpoena for Robert Emmerich's presence at the hearing is more troublesome. Although there is some fragmentary authority for the handling of motions to quash on an *ex parte* basis (see *Clinton v. Joshua Hendy Corp.*, 285 F.2d 848, 851 (9th Cir. 1960), certiorari denied, 366 U.S. 932, 81 S.Ct. 1654, 6

L.Ed.2d 391),[5] the better practice is one in which the party seeking the subpoena has the opportunity to contest the motion to quash. The district court's departure from the preferred practice in this case cannot be condoned, but it is also insufficient to alter the disposition of the case, for three reasons. First, the subpoena was dated September 6, 1979, and was apparently served at 6:00 p. m. that evening, the Thursday before the hearing, which commenced the following Monday morning. Emmerich, who was not a representative of any party to the action, promptly filed his motion to quash on Friday, the last working day before the hearing. Any delay by the district court would have mooted the motion, for Emmerich would have had to appear for the hearing on Monday, suffering the very inconvenience outlined as one basis for the motion to quash. Further, although defendant presumably received notice of the motion to quash or at least learned of the district court's order at the outset of the hearing, it did not raise the matter before the district court at that time although it could have sought either a motion to reconsider or a request for a continuance. By failing to adopt either course or even file an objection, defendant tacitly accepted the district court's disposition of the matter.

Second, any prejudice flowing from the district court's action was largely the result of defendant's own conduct. Defendant asserts that Emmerich's absence deprived it of certain documents relating to the performance standards Toro placed upon Reinders. Defendant had first attempted to discover the contents of the documents during its deposition of Emmerich, which took place on July 16, 1979, nearly two full months before the hearing. At that time, Emmerich's counsel instructed his client not to testify regarding the substance of the documents, arguing that they were irrelevant and immaterial as well as highly confidential (Exh. 33, A–14 to A–15). Although

defendant has here intimated that this refusal was not in good faith, it never presented the question to the district court as it was entitled to do under Rule 37. Defendant's subpoena of Emmerich, which sought production of the same documents requested for the deposition, therefore appears to have been a last-minute effort to fill a gap left by defendant's two-month delay in seeking appropriate relief. Although the district court should ordinarily hear the reasons of the subpoenaing party even under these circumstances, the effect of Judge Reynolds' ruling in this case was merely to return matters to the status quo brought about by defendant's own dilatoriness.

Finally, since the weakest link in defendant's case as Judge Reynolds perceived it was evidently not the character of the relationship between Toro and Reinders but rather the extent to which that relationship influenced defendant's conduct, the importance of the evidence omitted from the record is not considerable. In any event, even if Judge Reynolds did err and the record was less complete than may have been desirable, the error was not so severe as to vitiate the district court's exercise of discretion in granting the preliminary injunction.

*Equitable Considerations*

Notwithstanding the obvious importance of the plaintiff's likelihood of success on the merits, a preliminary injunction action does not involve a final determination of the substantive issues (see *Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321, 1324 (D.C.Cir.1968)), but rather brings to the fore those considerations ordinarily predominant in considering the exercise of the court's equity powers. The three remaining factors from *Fox Valley Harvestore, supra*, reflect these considerations. Of the three, the question whether plaintiff will suffer irreparable harm is sometimes

---

5. Cf. *Bank of Lincolnwood v. Federal Leasing Co.*, 622 F.2d 944 (7th Cir. 1980), in which the district judge *sua sponte* certified an issue under Rule 54(b) of the Federal Rules of Civil Procedure. In *Bank of Lincolnwood*, the ma-

jority found it unnecessary even to mention the unilateral character of the district court's action, and although the dissent did discuss the matter, it did not rest upon it in seeking to reverse the certification.

considered most important. *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206 (8th Cir. 1976); see also *Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420. The district court found that plaintiff. would suffer an irreparable loss of the good will accumulated with its customers during its 20 years as a Rain Bird dealer. Defendant has challenged this finding by arguing that Rain Bird products are available to plaintiff from other sources, if at a higher price. It also asserts, in reference to a second of the equitable considerations, that whatever harm may occur to plaintiff is more than outweighed by the harm to defendant from plaintiff's continued disparaging of Rain Bird products from its position of domination in the relevant market.

Even without the benefit of the presumption of irreparable harm expressly created by Section 135.065 of the WFDL, the record amply supports the district court's finding that termination of plaintiff may irreparably damage its good will. Interruption of plaintiff's direct supply of Rain Bird goods will clearly interfere with plaintiff's efficient servicing of a valuable segment of its clientele. Nor is defendant's evidence compelling that it will suffer harm from the status quo., Plaintiff continued to use defendant's products in its various contracts during 1978 even in the face of a threatened termination, and whatever decline in use occurred in 1979 is no doubt attributable in part to uncertainty over continued supply. As the district court noted, defendant is free to set up competing distributors in plaintiff's dealership territory, distributors that can fill part of any void left by a lack of enthusiasm on plaintiff's part for Rain Bird products.

Defendant counters that establishing competing dealerships will not counteract the harm because Reinders has a dominant position as a seller in the geographic market. Even if this is the case, it does not bear directly on the question of balance of harms, for even if defendant is permitted to discontinue plaintiff, defendant will still be confronted with plaintiff's dominant position.[6] A similar inconsistency afflicts defendant's argument on the public interest, where with some ingenuity defendant has most vigorously pursued its allegations concerning plaintiff's position in the market. Thus defendant has argued that a preliminary injunction will disserve the public interest for it will allow plaintiff, which according to some of the record evidence now controls more than 50 percent of the sprinkler market in its geographical area, to maintain its dominant, anti-competitive position. But the nonexclusive character of plaintiff's dealership suggests that it is Reinders' salesmanship and established name rather than the products it sells that permits plaintiff to dominate the market so successfully, a conclusion buttressed by the relative interchangeability of sprinkler products. But if plaintiff's marketing strengths rather than the products it distributes accounts for its marketing power, the presence or absence of a preliminary injunction will have only a marginal effect on that position and therefore does not greatly implicate public interest concerns.[7]

To this consideration may be added the exiguous state of the record on these antitrust considerations.[8] Although defendant has collected several statements regarding the percentage of the "market" held by plaintiff, it has provided only scant evidence from which the district court might

---

6. Moreover, plaintiff will, by defendant's own admission (Br. 41), continue to have access to Rain Bird products so that it will be able to use the Rain Bird line in its alleged attempts to dominate the market.

7. We hasten to add that this argument is not inconsistent with our earlier conclusion that plaintiff will suffer irreparable harm. That the preliminary injunction may have only a marginal effect on plaintiff's ability to dominate does not mean that in its absence plaintiff

could not still lose a small but valuable part of its clientele, a loss not compensable in monetary damages.

8. The evidence excluded from the record as a result of the two discovery irregularities would not have added significantly to defendant's antitrust claims. In addition, as noted above, the absence of this evidence from the record was largely the fault of defendant.

determine the actual competitive situation. There is, for example, virtually no material on what the relevant geographic and product markets are for the Rain Bird items plaintiff sells. The random statements of the parties cannot substitute for solid evidence on such matters as geographical selling patterns or elasticity of demand. In part this dearth of materials stems from the novelty of defendant's argument, which inverts the usual pattern in a case of this sort, taking antitrust considerations ordinarily found in the dealer's case on the merits and placing them within the manufacturer's case on the public interest. But this novelty does not relieve defendant of its obligation to demonstrate the soundness of its point. It cannot expect the district court to issue findings on plaintiff's possible violations of the antitrust laws, findings that could possibly have an impact on plaintiff far beyond the outcome of this case, without developing the record necessary for doing so in an intelligent and coherent manner.

While it might have been preferable for the district court to consider defendant's antitrust claims, defendant's antitrust showing is weak and suffers from the aforementioned inconsistency. In light of the public interest the district court noted that Wisconsin has expressed in protecting local dealers, the speculative evidence on the antitrust violations is simply insufficient to govern the public interest concerns relevant to this diversity case. Again, defendant will have its opportunity to advance its antitrust arguments in the appropriate context during trial on the merits.

*Failure to Require Bond*

Defendant's final argument is that the district court erred in failing to consider defendant's demand for a bond to reimburse it for any injury it may improperly suffer as a result of an erroneous grant of the preliminary injunction. Rule 65(c) of the Federal Rules of Civil Procedure states:

"(c) *Security.* No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. * * *."

Although the case law has somewhat weakened the force of the "no order shall issue" language of the rule (*Wayne Chemical, Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972)), the cases do not sanction the district court's decision to ignore defendant's request completely. To the contrary, the precedents indicate that in cases such as this, the court should entertain and expressly rule on the request (*Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538–539 (6th Cir. 1978), certiorari granted, 440 U.S. 944, 99 S.Ct. 1420, 59 L.Ed.2d 632, certiorari dismissed under Supreme Court Rule 60, 442 U.S. 925, 99 S.Ct. 925, 61 L.Ed.2d 292), and that, absent extraordinary circumstances, the court errs in not granting it. *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1145 (3d Cir. 1977).

Accordingly, while affirming the orders of September 21 and October 19, 1979, granting a preliminary injunction, we remand the case so that the district court may comply with the dictates of Rule 65(c).