LTD COMMODITIES, INC.,
Plaintiff-Appellant,

v.

Igor G. PEREDERIJ and Beacon Data Processing Service Corporation, Defendants-Appellees.

No. 82–1349.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1982.

Decided Feb. 8, 1983.

---

Stephen J. Spitz, Sperling, Slater & Spitz, Chicago, Ill., for plaintiff-appellant.

Harry D. Lavery, Berger, Newmark & Fenchel, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and DUMBAULD,* Senior District Judge.

DUMBAULD, Senior District Judge.

"The law's delay" of which Shakespeare and Dickens eloquently speak, is frequently more truth than poetry or fiction. It is often inordinately prolonged, especially since the "litigation explosion" and mounting caseloads in the courts. Yet in many cases vital interests of litigants may be jeopardized by procrastination, and immediate action may be necessary to prevent irreparable injury threatened by intervening circumstances. The court's final judgment may prove nugatory and futile if measures of relief *pendente lite* are not taken in the meantime.[1]

How are these conflicting necessities to be reconciled? In practically every developed legal system[2] some form of interlocutory remedy is provided.[3] In federal procedure the temporary restraining order and preliminary injunction perform this function. Their issuance is always discretionary, and unlike a final decree can never be a matter of right. The standard of appellate review is whether the court below abused its discretion.[4]

---

*The Hon. Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. Dumbauld, *Interim Measures of Protection in International Controversies* (1932) 6–7.

2. Even at an early period in Roman law the example is recorded of the praetor's intervention when two parties are struggling for possession of a slave. Commanding both to let go ("*Mittite ambo hominem*") he regulates the *status quo pendente lite*. *Ibid.*, 35.

3. In a notable pronouncement by an international tribunal it was declared that by measures of interlocutory relief the courts strive to remedy the delays incident to administration of justice, so that insofar as possible the result of the case will be the same as if it could end in a day. "Par les mesures conservatoires les tribunaux cherchent à remédier aux lenteurs de la justice, de manière qu'autant que possible l'issue du procès soit le même que s'il pouvait se terminer en un jour." German-Polish Mixed Arbitral Tribunal, July 29, 1924, quoted in *ibid.*, 20.

4. *Ibid.*, 60–61; *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Yakus v. U.S.*, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944); *Meccano Ltd. v. John Wanamaker*, 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822 (1920).

As stated in a recent case in this Circuit, *O'Connor v. Board of Education,* 645 F.2d 578, 580 (7th Cir.1981):

> The district court's exercise of discretion in issuing a preliminary injunction is guided by four familiar factors:
>
> (1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;
>
> (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;
>
> (3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and
>
> (4) whether the granting of a preliminary injunction will disserve the public interest.

*Reinders Bros. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 48 (7th Cir.1980). The likelihood of success factor serves as a threshold requirement. We have held that if this factor is unsatisfied, and if the plaintiff has not shown irreparable injury, the court need go no further in denying the preliminary injunction. *Kolz v. Board of Ed. of City of Chicago,* 576 F.2d 747 (7th Cir.1978).

Most private litigation does not substantially affect the public interest, and in exercising its discretion the court can usually confine its consideration to weighing the two principal factors: the hardship to the parties respectively and the probability of their ultimate success on the merits.

Because of the nature and function of relief *pendente lite* as a regulation of the interim *status quo* so as to assure that the prevailing party when final judgment on the merits has been rendered will not find his victory valueless, it is ordinarily true that preliminary relief is not granted which is identical with that which a party would obtain upon winning the case on the merits. As a rule courts are unwilling before full adjudication to order affirmative action, transfer of possession, or change in the existing status. (But the status itself may be one of continuing action, such as furnishing the services of a public utility; and it is the last uncontested status preceding the controversy which is to be maintained by the court, rather than a status wrongfully altered by unilateral action after dispute has arisen.)

Nevertheless sometimes preliminary and final relief may coincide in content, where such a result is warranted by the circumstances of the case in the light of the nature and function of relief *pendente lite.* For example, if the only object of the final judgment in a case is to prohibit commission of a wrongful act, and the preliminary injunction forbids it temporarily, the two decisions are factually equivalent in content.[5] A well known illustration is furnished by the case of the United States against Iran before the International Court of Justice relating to the hostages. The Court's order of December 15, 1979, indicated, *inter alia,* as provisional measures *pendente lite,* the immediate release of the hostages:

> A. (i) The Government of the Islamic Republic of Iran should immediately ensure that the premises of the United States Embassy, Chancery and Consulate be restored to the possession of the United States authorities under their exclusive control, and should ensure their inviolability and effective protection as provided for by the treaties in force between the two States, and by general international law;

---

**5.** Another example of overlapping content is furnished by obligations of support or alimentation in domestic relations law. Thus when a needy mother obtained a support order under German Civil Code § 1716 against the *putative* father of her illegitimate child for support during its first three months, this payment is not provisional anticipation of the duty of the father of an illegitimate child to support it until the age of 16 (§ 1708). The preliminary payment to relieve distress may be smaller than would be required by the scale of support later to be adjudged under § 1708. It is a separate obligation imposed because the legislator has found that since in many cases the *prima facie* father will be found to be the real father, it is better that he should relieve the urgent need than that the community should do so. Dumbauld, *Interim Measures of Protection in International Controversies* (1932) 23, 86–87.

(ii) The Government of the Islamic Republic of Iran should ensure the immediate release, without any exception, of all persons of United States nationality who are or have been held in the Embassy of the United States of America or in the Ministry of Foreign Affairs in Tehran, or have been held as hostages elsewhere, and afford full protection to all such persons, in accordance with the treaties in force between the two States, and with general international law;

(iii) The Government of the Islamic Republic of Iran should, as from that moment, afford to all the diplomatic and consular personnel of the United States the full protection, privileges and immunities to which they are entitled under the treaties in force between the two States, and under general international law, including immunity from any form of criminal jurisdiction and freedom and facilities to leave the territory of Iran;

B. The Government of the United States of America and the Government of the Islamic Republic of Iran should not take any action and should ensure that no action is taken which may aggravate the tension between the two countries or render the existing dispute more difficult of solution.

The final judgment of May 24, 1980, decided, *inter alia,* that Iran "must immediately terminate the unlawful detention of ... United States nationals now held hostage in Iran." *I.C.J. Reports* 1980, 3, 44.

The identical content of the two pronouncements does not detract from the propriety of the indication of provisional measures. The basic rule that an interim measure does not prejudice the final decision on the merits is a rule regarding the effect or consequences of the preliminary injunction, not a rule respecting the conditions or circumstances in which it may be granted.[6]

■ The foregoing discussion suffices to demonstrate that although the order of the District Judge requiring irrevocable payment of money in advance of trial is rather unusual and unorthodox, it is not necessarily for that reason invalid or an abuse of discretion. In light of the unusual circumstances in the case at bar, and the agreements of the parties made in the course of the court proceeding, we conclude that no reversible error has occurred.

Analysis of the record will disclose that Judge Shadur in fact made the appropriate evaluation of each party's hardship and likelihood of ultimate success, and weighed and compared the interests involved. Further disclosed is the fact that, as a result of the Judge's actions and the negotiations and agreements of the parties during the discussion at the hearing, each party in fact obtained the protection it desired for its respective irreparably threatened interests.

■ This will appear from a brief review of the proceedings. Plaintiff (LTD) is a mail order house whose orders, billing, and other records are computerized and embodied in tapes, cassettes, or other tangible articles owned by LTD but used by defendant (Data) a computer service bureau in performing work for LTD under a contract which gave Data a lien on those articles until paid for service performed.

LTD provided 40 percent of Data's business, and was given a reduced price by Data upon the understanding that Data would be used by LTD for two more Christmas seasons.[7] LTD paid the bill at the low rate. Then in January, 1982, LTD demanded its materials back, supposedly for use in testing on a Burroughs computer LTD was

---

**6.** Indeed in rendering its final judgment the court is not bound by its interlocutory decision, and may even vacate it or determine that it was improvidently granted.

**7.** On the issue of credibility the Court specifically found that Data "had the good faith belief that their reduction of rates ... was coupled with and therefore conditioned on the understanding that LTD would remain with [Data] for at least 2 Christmas seasons. When LTD demonstrated that it had not so intended and [Data] had therefore been misled, [Data] had a reasonable basis for rescinding the reduction and billing LTD for the difference." Appellee's App. xiv.

planning to buy in order to handle its work "in house" rather than use Data. Thereupon Data revoked the price concession and billed LTD for the amount thereof (amounting to $127,960.19).

LTD then filed suit, seeking a temporary restraining order requiring Data to make LTD's computer materials available to LTD, without which LTD's business would be totally deranged and irreparable injury would ensue.

At the TRO hearing Judge Shadur did weigh the comparative hardship to the parties respectively, making express reference to the four *O'Connor* criteria. He recognized that LTD would suffer irreparable injury without access to its computer software, but that to order turnover of these vital materials would be a change in the existing *status quo* where Data had possession of them, and claimed a lien for the adjusted price of work performed for LTD. Such change would irreparably injure the business interests of Data, in view of the large proportion of Data's business which the work for LTD represented. In fairness to both parties, therefore, Judge Shadur ordered that LTD receive its computer materials, but that LTD make funds available which the Court could order paid to Data in the event that plaintiff failed to obtain a preliminary injunction. Under these conditions, if LTD failed to obtain equitable relief by way of preliminary injunction, it should be in no better position than it was before the *status quo* was changed by the turnover of the vital computer materials; that is to say it should be required to litigate at law a pecuniary claim regarding the merits of Data's adjusted billing and the validity of its asserted lien.

Judge Shadur made very plain the conditions upon which he would exercise his discretion to grant the TRO, conditions which were fair to both parties and enabled each to obtain what it thought was essential protection to its vital interests and would ward off threatened irreparable injury to those interests. Counsel for LTD clearly understood the conditions imposed by the Court and agreed to them on behalf of LTD.

Judge Shadur stated: "If, for example, the result of a hearing on preliminary injunction is that the plaintiff is not entitled to preliminary injunctive relief, which means that they would have changed the *status quo* by their obtaining of the property, then under those circumstances they should be in no better position than ... the contract gives them under which circumstances the funds should be released to substitute for the assets in your hands, and at that point they may have a law claim for dollars ... [Y]ou understand, Mr. Spitz, the point that I am making." LTD's counsel replied "I do, your Honor." Judge Shadur repeated:

THE COURT: That if you do not establish your right to get the preliminary injunctive relief, then the funds that you have put up, will have put up in substitution for the assets, would simply be released to the defendant here, and you would have to abide your ability to succeed on the merits.

MR. SPITZ: I understand exactly. I know I am at risk, on that.

THE COURT: All right.

MR. SPITZ: And that is my intention posting the security.

THE COURT: All right. Mr. Lavery, under those circumstances it seems to me there is a sufficient basis ... to support ... the temporary relief that is sought, but on the conditions I have expressed. [Tr. 11–12; Appellees' App. iii–iv]

Further on Judge Shadur reiterated:

THE COURT: Mr. Spitz, I will tell you, if you are not entitled to preliminary injunctive relief, then the funds would go over because at that point you would simply have a lawsuit... You simply have a lawsuit for money.

MR. SPITZ: I understand what you are saying.

[Tr. 21, Appellees App. xi]

Subsequently, after further hearing, the Court denied plaintiff's motion for preliminary injunction, and by order of March 4, 1982, directed the payment of $127,960.19 to Data. [Appellant's App. i].

At the hearing on preliminary injunction, Judge Shadur ruled that since LTD now had the computer materials as a result of the disposition agreed to at the TRO hearing, there was no irreparable injury, LTD now having only a pecuniary claim. The Court stated:

Without this lawsuit LTD could have gotten its property on payment of the bill. It would then have had a claim against the defendants, if that bill was wrongful. That's the posture that would have happened before this lawsuit, and that's the posture in which the Court would leave the parties by the denial of the preliminary injunction. [*Ibid.,* xi]

■ Another ground upon which the District Court denied the preliminary injunction was that LTD had not established a reasonable likelihood of success on the merits. LTD's lawsuit was based on the contention that Data's refusal to turn over the computer materials constituted "extortion" in violation of the RICO statute (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*). Judge Shadur held that "This is a good faith commercial dispute and it is not criminal" [*Ibid.,* viii]. Without passing upon the merits of this contention, it suffices to say that to regard a commercial dispute between two business organizations about the validity of a "mechanic's lien" as an offense smacking of organized crime is certainly a merely arguable position, one displaying counsel's ingenuity, but not such a well-established and indisputable proposition of law that we can find Judge Shadur's contrary holding to be clearly erroneous and an abuse of discretion. Plaintiff's lack of likelihood of ultimate success on the merits constitutes an independent ground for denial of the preliminary injunction under the standards of *O'Connor, supra.*

The decision of the District Court is AFFIRMED.

PELL, Circuit Judge, dissenting.

Because the affirmance of the district court's opinion in this case appears to me to create an unfortunate judicial precedent regarding the exercise of the powers of an equity court, I respectfully dissent.

Briefly reviewed, the facts are as follows: The plaintiff (LTD) was the owner of computer materials it used in its business. These tangible materials were in possession of defendant (Data), a computer service bureau which utilized in its processing the materials owned by LTD. The parties fell out. The nature of LTD's business was such that there would have been irreparable injury to it if it was deprived of the use of the computer materials.[1] LTD went to court seeking, *inter alia,* a temporary restraining order (TRO) and a preliminary injunction. The suit filed also sought relief on various commercial claims as to which there was no independent federal jurisdiction. Federal jurisdiction was achieved, notwithstanding that the allegations basically concerned an ordinary commercial dispute between contracting businessmen, by virtue of the assertion that Data's fraud in attempting to collect more money than was due Data violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968.[2]

The court granted a TRO requiring certain of the property of LTD to be turned over to it by Data. Originally LTD had only sought access to the materials but the TRO was modified to provide that all LTD programs and systems would be turned over to it. Data's claim for allegedly unpaid services was $127,960.19.[3] Although Data

---

1. The district court finding in this respect reads as follows:

    LTD has no adequate remedy at law. If this TRO does not issue, LTD will be irreparably injured. If the relief requested is not granted, LTD's business will incur severe damage, present and future, including loss of prospective business and customer good will, all of

    which is highly substantial, but extremely difficult to specifically ascertain.

2. The district court ruled that the complaint stated a claim under RICO and that the pleadings, and not the actual facts, are determinative of federal jurisdiction.

3. Data's contention in this respect was that although it had previously billed and been paid

did not contest LTD's ownership, it contended that it was entitled to possession of the property pursuant to its contract and also pursuant to an artisan's lien.[4] Because of the mandatory aspects of the TRO, LTD posted a letter of credit in excess of Data's claim.

Subsequently, the court denied a preliminary injunction because LTD, having recovered all of the computer materials as a result of the TRO, had obtained all the relief that it sought, and there was no longer a threat of irreparable injury.

It is at this point that I begin to fail to follow the district court's reasoning. Data had turned the property over pursuant to a court order and it would seem if that court order was not extended by a preliminary injunction then the property should have been returned to the status quo ante. I fail to understand why the district court did not continue the effect of the TRO as a preliminary injunction and leave the letter of credit posted to secure Data's claim in the event Data should ultimately prevail at trial. This would seem to be the normal, equitable procedure. Instead the district court at the time of denying the preliminary injunction ordered that there be drawn out of the letter of credit the total amount of Data's claim which amount was to be turned over to Data without any security for its return in the event Data should not ultimately prevail.

The hearing on the preliminary injunction was concluded on March 4, 1982. At that time the district court, after rendering its opinion from the bench, entered an order denying LTD's motion for a preliminary injunction and as a part of that order further ordered that:

> Defendant, 'Beacon Data Processing Service Corporation, is hereby given leave, and may, draw the sum of One Hundred Twenty-Seven Thousand Nine Hundred Sixty and 19/100 Dollars ($127,-960.19) against First National Bank of Chicago Irrevocable Letter of Credit No. 1266-00302056, (opener's reference no. 302056), dated February 17, 1982, as amended February 19, 1982.

It seems clear to me that this turnover order, a part of the order denying the preliminary injunction, and certainly intertwined with the injunctive issue, is very much, as it should be, an issue before this court.

The majority opinion refers to the order of the district judge "requiring irrevocable payment of money in advance of trial as rather unusual and unorthodox." This characterization is an understatement of what I regard as a flagrant abuse of the equity power of the court. I recognize that LTD had received its property back and was able to use it pursuant to a court order which it could not have done if there had been a valid lien entitling Data to keep possession of the property. If LTD, however, had gone into a state court, as probably it should have rather than attempting the somewhat bizarre, and certainly questionable, RICO approach in federal court, and had sought relief by way of a traditional conversion action, Data to retain possession would have had to post security for the retention and in the absence of such posting LTD could have taken under the writ but also only after posting security to protect Data.

Here the district court's action was such that rather than treating the letter of credit as security for the payment of such sums to which Data might ultimately be entitled on its counterclaim, it was paid in full on that counterclaim without any obligation or protection to LTD. It was given the money just as though it had been successful in establishing its counterclaim and a judgment had already been entered in its favor.

---

for its services, a special low rate had been given because of its expectation with regard to the duration of its contract and when this contract was in the process of being terminated it submitted a supplemental billing in the amount mentioned above.

**4.** Although it is not perhaps material at this point of the proceedings in connection with my dissent, I do note that my examination of the briefs and record failed to reveal any provision of the contract justifying continued possession and no reference to Illinois law creating a lien under the circumstances here involved.

Yet at the time the order was entered all that Data had was a claim in the form of its counterclaim. The majority opinion refers to "conditions which are fair to both parties and enable each to obtain what it thought was essential to protect its vital interest." Unfortunately, when a litigant is forced to pay a claim before that claim has been judicially established, it is not being treated fairly. The most the opponent should be entitled to have is security that it will be paid upon the establishment of its claim. The procedure here, to me, seems simply to violate well established equity principles of fair treatment of litigants.

The district court in denying the preliminary injunction stated that LTD now had "only a pecuniary claim." This, of course, is correct. What the district court did not say was that LTD has now only "an unsecured pecuniary claim." There was some indication that the financial condition of Data was not an entirely healthy one. If it should be determined at the conclusion of this litigation, in this period of failing businesses, that Data indeed had no claim as a result of second guessing on its billings, LTD's only alternative would be to join the ranks of unsecured creditors. The court's action perhaps might be understandable if tangible personal property such as computer hardware had been security and was turned over to Data for its use during the pendency of its action and then could have been returned to LTD if Data's claim was not established. Unfortunately, here we are dealing with money which can be readily dissipated without any replacement if the dissipator has become insolvent.

The only troublesome aspect to me of the position I have taken is that to some extent the record could be construed as indicating LTD consented to the turnover action. A careful reading of the record, however, indicates to me that such an unusual intent as here involved on the part of any litigant cannot be properly, or lightly, inferred from this record. Even though LTD, because of the nature of its business, had a desperate need for immediate possession of its property I do not think the record indicates it was prepared through its counsel to engage in this Faustian potential giveaway. The record does not show that there was a clear understanding between the court and counsel and in view of the ambiguous colloquies between court and counsel,[5] it appears to me that it was the responsibility of the court to follow ordinary procedures of fairness and equity.

Further, there is no reference to any agreement by plaintiff's counsel in the findings of fact or conclusions of law. There is no indication that the district court relied on any such agreement in reaching its decision. This would have been an agreement of waiver which should only be found to exist where the proof is clear and explicit. It wasn't here.

---

5. Thus, the following occurred:

Mr. Spitz (plaintiff's counsel): So let us take that analysis.

If you preliminarily determine that they have a claim, and a valid lien, or a valid right to this money, fine, but why should they get the money only because if I am not successful in my preliminary injunction? Why isn't there a determination, if you are going to turn over $127,000 to them, that their [sic] entitled, at least in some preliminary fashion, to that money?

Why, if it is not security for the wrongful issuance of the preliminary injunction, why would it turn on that?