2012 WY 51

**OPERATION SAVE AMERICA,**
**Appellant (Defendant),**

v.

**The CITY OF JACKSON, a Wyoming municipal corporation, Appellee (Plaintiff).**

**No. S–11–0149.**

Supreme Court of Wyoming.

April 10, 2012.

Representing Appellant: Jack D. Edwards of Edwards Law Office, P.C., Etna, Wyoming.

Representing Appellee: Audrey P. Cohen–Davis of The City of Jackson, Jackson, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] The Town of Jackson applied to the district court for an ex parte temporary restraining order (TRO) against Operation Save America (OSA), an anti-abortion protest group. The Town sought to restrict OSA's demonstration activities in and around the Jackson Town Square during the Boy Scouts' 2011 annual Elk Fest. The district court granted the ex parte TRO, which enjoined OSA "from assembling on the Jackson Town Square without a permit or holding post-

ers/signs or materials of any graphic nature (e.g., aborted fetus pictures) on the Town Square or within a two (2) block radius thereof ... during the Boy Scouts of America Expo and Elk Antler Auction between 5:00 a.m. and 5:00 p.m. on Saturday, May 21, 2011."

[¶ 2] We find that the ex parte TRO was issued in violation of the First Amendment to the United States Constitution and Rule 65 of the Wyoming Rules of Civil Procedure and reverse.

### ISSUES

[¶ 3] Both parties present numerous procedural and substantive issues for our review. Appellant, OSA, frames the issues as follows:

1. The district court did not have subject matter jurisdiction to issue an *ex parte* temporary protection order.

 a. The City of Jackson did not have standing to pursue an *ex parte* temporary protection order against Operation Save America.

 i. The Plaintiff did not allege a potential injury to the Plaintiff or a potential violation of Plaintiff's rights.

 b. The *Order Granting Temporary Restraining Order* was issued *ex parte* and not issued during any litigation. W.S. § 1–28–102.

 i. Thus no claim for relief had been stated therefore no possible way to prevail upon the merits of the case.

 c. There was no attempt to give notice to the defendants of the *ex parte Petition for Temporary Restraining Order and/or Injunction* pursuant to W.R.C.P. 65(b)(2) nor any showing made that it is impossible to serve or notify the opposing parties and to give them an opportunity to participate in an adversary proceeding pursuant to *Carroll v. Princess Anne*, 393 U.S. 175 [89 S.Ct. 347, 21 L.Ed.2d 325] (1968).

 d. The Court did not address nor require the posting of a security pursuant to W.R.C.P. 65(c).

2. The district court did not have personal jurisdiction over the defendants.

 a. No summons and no complaint were served upon the defendants at any time.

3. The restrictions outlined in the *Order Granting Temporary Restraining Order* are in violation of Art. I, § 21 of the Wyoming Constitution.

4. The restrictions outlined in the *Order Granting Temporary Restraining Order* are in violation of the First, Fifth and Fourteenth Amendment of the United States Constitution.

[¶ 4] Appellee, the Town of Jackson, presents the issues as follows:

1. Whether there is a direct appeal from the ex parte *Order Granting Temporary Restraining Order* initially issued by the District Court.

 1. A temporary restraining order differs from an injunction.

 2. There should be no direct appeal from this *Order Granting Temporary Restraining Order.*

2. Whether an appeal from this validly issued *Order Granting Temporary Restraining Order* is moot because it expired on its own terms and no motion to vacate or set aside, motion to extend terms of *Order Granting Temporary Restraining Order* or a preliminary injunction issued.

 1. The *Order Granting Temporary Restraining Order* was validly and properly issued pursuant to W.R.C.P. 65(b).

 2. The *Order Granting Temporary Restraining Order* expired on its own terms w/in time set for rule and no motion to vacate or set aside, motion to extend terms of temporary restraining order or preliminary injunction issued.

3. Whether the District Court had subject matter jurisdiction to issue the ex parte *Temporary Restraining Order* pursuant to W.R.C.P. 65 and W.S. § 15–1–103(a) (xviii).

 1. The Town of Jackson had standing to pursue an ex parte temporary restraining order against Operation Save America.

 2. The *Order Granting Temporary Restraining Order* was issued ex parte pursuant to W.R.C.P. 65(b), which does

not require that it be issued during a current litigation.

3. W.R.C.P. 65(b)(2) is the relevant evaluation for a temporary restraining order and standing.

4. The Court did not need to address or require the posting of a security pursuant to W.R.C.P. 65(c).

 a. A bond is not necessary where the only damages are those that lie in tort.

 b. Under W.R.C.P. 65(c), the Court's discretion as to whether a bond should issue is best analyzed under the "as the court deems proper" language of 65(c).

4. Whether the District Court had personal jurisdiction over the Defendant, Operation Save America.

5. Whether the restrictions outlined in the *Order Granting Temporary Restraining Order* were in violation of Art. I, § 21 of the Wyoming Constitution.

6. Whether the restrictions outlined in the *Order Granting Temporary Restraining Order* were in violation of the First, Fifth and Fourteenth Amendments of the United States Constitution.

 1. The *Order Granting Temporary Restraining Order* was a content neutral reasonable time, place and manner restriction within the regulatory powers of the Town.

 2. Even if the restrictions in the *Order Granting Temporary Restraining Order* [against OSA] are deemed content-based, they still meet the strict scrutiny standard.

 a. The issuance of the *Order Granting Temporary Restraining Order* against OSA is distinguishable from *Lefemine* because the TRO meets the strict scrutiny test.

 3. The argument that the *Order Granting Temporary Restraining Order* or the Town violated OSA's Fifth and Fourteenth Amendment rights is untenable.

## FACTS

[¶ 5] OSA is an anti-abortion organization incorporated under the laws of Texas. Approximately twenty of its members arrived in Jackson, Wyoming, on Wednesday, May 18, 2011. The group's purpose in coming to Jackson was to protest against Dr. Brent Blue and his clinic, which clinic OSA reported to be the only one in Wyoming performing abortions.

[¶ 6] At 7:00 on the morning of Wednesday, May 18th, OSA began its demonstrations by assembling at the Jackson Hole High School and Jackson Hole Middle School. The group handed out flyers calling Dr. Blue a "killer" and showing photographs of an aborted fetus. It also held up large photographs, approximately four-feet by four-feet, of disfigured and aborted fetus images. In one incident, an OSA member boarded an occupied school bus, showed the grade school age children the aborted fetus images and asked them if they knew that Dr. Blue is a "killer."

[¶ 7] Robert Gilliam, Operations Lieutenant for the Jackson Police Department, described the public response to the demonstrations and his interactions with OSA:

8. Since Wednesday morning, the group has consistently demonstrated throughout the Town of Jackson showing the same graphic photographs. The group has refused repeated requests from me and other law enforcement officials to remove these graphic photographs. This came after police received several hundred phone calls, emails, personal visits and face to face complaints from citizens who see the photographs as obscene and offensive.

9. I have personally had direct contact with more than 40 citizens who have complained to me that the photographs displayed by this group are grossly offensive and obscene. Many of these citizens have had tears in their eyes and were extremely upset after viewing the photographs; some appeared traumatized.

10. The police department, sheriff's office and the Town of Jackson have all fielded many calls and complaints from parents whose children have been forced to view these graphic photographs displayed by

the Operation Save America group. The conversations that I have had with their leaders, including Pastor Mark Hollick and Mr. Chet Gallagher, regarding the graphic signs have been cordial, but matter-of-fact like. They acknowledge the signs are graphic and offend most people, but that is their intent. They wish to "shock" the public into taking their side on the abortion debate in this country.

\* \* \* \*

13. Additionally, the group[']s presence in Jackson has sparked a sizable group of counter demonstrators. On Friday, May 20, a counter demonstrator upset after viewing the graphic photographs, attempted to strike with his vehicle one of the Operation Save America members who was holding one of the graphic photographs. The driver was arrested and charged with aggravated assault.

[¶ 8] During the same week that OSA was demonstrating in Jackson, the Boy Scouts of America were planning to hold their annual Elk Fest in the Jackson Town Square. The Boy Scouts had, on March 30, 2011, applied for and received a permit for the exclusive use of the Town Square for the event's festivities to be held on Saturday, May 21st. The planned activities were scheduled from 5:00 a.m. to 3:00 p.m. that day, and they included various booths for family activities, a Boy Scout Expo and Demonstrations, a Rotary Private Antler Sale, the Boy Scout Antler Auction, and a Jackson Youth Baseball food tent. Approximately two hundred Boy Scouts between the ages of seven and fourteen were expected to attend the event.

[¶ 9] At some point between Wednesday, May 18th, and Friday, May 20th, Lieutenant Gilliam asked Pastor Mark Hollick and Chet Gallagher of OSA to refrain from displaying the graphic photographs at the Boy Scout event. Pastor Hollick and Mr. Gallagher responded that OSA reserved its right to display the photographs in any public setting.

[¶ 10] On Friday, May 20, 2011, at 3:29 in the afternoon, the Town filed in district court a Petition for Temporary Restraining Order and/or Temporary Injunction (Petition). The Petition requested an order restricting protestors and counter-protestors from protesting during the Elk Fest between 5:00 a.m. and 5:00 p.m. on Saturday, May 21, 2011, within two blocks in any direction from the Town Square. In support of the Petition, the Town stated, in part:

9. The Town submits that it is a compelling interest to protect the 200(+) children and Boy Scouts attending the Elk Fest from being exposed to protestors holding and displaying large signs containing pictures of dismembered, aborted fetuses, or counter-protestors['] similar shocking and graphic materials. (*See Lieutenant Bob Gilliam Affidavit attached hereto as Exhibit B.*)

\* \* \* \*

13. As set forth in the Affidavit of Robert Gilliam attached as Exhibit B, it clearly appears that immediate and irreparable injury, loss or damage will result to the children of the Town at tomorrow's Elk Fest. Moreover, the Jackson Police Department has informed Defendant representatives of the Town's position concerning this specific location at this specific time, and they disagree. Undersigned counsel certifies to this court that she personally has not made any efforts to notify the Defendants of this temporary injunction due to the hostility of the current situation, contrary position of Defendant representatives and the immediate need for injunctive relief by this court before tomorrow morning at 5am.

\* \* \* \*

17. There will be no harm to the Defendant and counter-protest groups because they can protest in other public places within the Town during the Elk Fest. To the contrary, *the harm suffered by children being exposed to the constant and continuous shocking graphic materials during the Elk Fest is enormous and there is no way to place an actual value on such damage to over 200 children and they are speculative.* (*See Lieutenant Bob Gilliam Affidavit attached hereto as Exhibit B.*) Thus, equitable relief is appropriate. (Emphasis in original.)

18. Finally, there is a substantial and significant public interest in protecting children and Boy Scouts who have been granted a special event permit for exclusive use of the Town Square, from large displays of graphic materials during such event and during the requested hours. The public interest in preventing such injustice is enormous.

[¶ 11] The district court granted the Petition, and at 8:43 p.m. on Friday, May 20th, it issued an Order Granting Temporary Restraining Order (TRO). In issuing the TRO, the court did not include counter-protestors in its coverage, noting:

In the body of the petition, Plaintiff has sought to include "counter-protestors" in the Temporary Restraining Order. However, the group has not been named as a party. The Court has not found sufficient evidence in the accompanying affidavit of immediate or irreparable injury that would justify the inclusion of any counter-protestors in the Temporary Restraining Order.

[¶ 12] The district court found that the Town had made the requisite showing for the TRO to issue ex parte.

With respect to element (1), the Court finds that Plaintiff has made a sufficient showing of immediate and irreparable injury. More specifically, the Court finds, and it has been averred by affidavit, that irreparable injury would follow from the children being exposed to the constant and continuous shocking graphic materials of the protestors, and also from the threat of public disturbance, breach of peace and violence.

Regarding element (2), Plaintiff has certified its efforts and reasons why notice should not be required. The Jackson Police Department has informed representatives of Operation Save America of the Town's position with respect to its planned protest at the Town Square during the Boy Scout event, and the group has continued to assert its intention of protesting on the Square at that time. In light of the hostility of the current situation and the immediate need for injunctive relief, the applicant's attorney has informed the Court that she has not attempted to notify the Defendant of this temporary injunction. Further, the Court has not provided notice to Defendant because this Order is being issued after business hours on May 20, 2011 without time for a hearing before the scheduled event.

[¶ 13] After concluding it could issue the order ex parte, the district court then analyzed the proposed restriction under First Amendment constraints. The court did not explicitly find that the restriction was content-based and intended to restrict speech in a traditional public forum, but it nonetheless applied the strict scrutiny required for that type of restriction. It concluded:

[T]here is a compelling interest to protect the two hundred plus children and Boy Scouts attending the Elk Fest from being exposed to protestors holding and displaying large signs containing pictures of aborted fetuses. Further, the Court finds that the Town's proposed restriction is narrowly tailored to protect and serve that compelling state interest in that it is restricting Operation Save America from its protest activities for a limited number of hours within a limited geographic area in the Town of Jackson.

[¶ 14] Based on its findings, the district court granted the TRO in the form that the Town requested. The TRO restricted OSA as follows:

IT IS HEREBY ORDERED that Defendant is enjoined from assembling on the Jackson Town Square without a permit or holding posters/signs or materials of any graphic nature (e.g., aborted fetus pictures) on the Town Square or within a two (2) block radius thereof, that is, not within the two square block area:

north of Pearl Avenue,

west of Willow Street,

south of Gill Avenue,

and east of Milward Street

during the Boy Scouts of America Expo and Elk Antler Auction between 5:00 a.m. and 5:00 p.m. on Saturday, May 21, 2011.

[¶ 15] The Boy Scout event went forward as scheduled, and the TRO expired by its own terms at the conclusion of the event at

5:00 p.m. on May 21, 2011. On May 27, 2011, OSA filed its Notice of Appeal.

## STANDARD OF REVIEW

[¶ 16] Jurisdictional questions are legal issues that this Court reviews *de novo*. *Dawes v. State*, 2010 WY 113, ¶ 10, 236 P.3d 303, 306 (Wyo.2010) (subject matter jurisdiction is a question of law considered *de novo*, without regard to the district court determination); *Meyer v. Hatto*, 2008 WY 153, ¶ 14, 198 P.3d 552, 555 (Wyo.2008) ("The question of whether personal jurisdiction can properly be exercised in Wyoming is therefore a question of law to be reviewed *de novo*."); *Northfork Citizens for Responsible Dev. v. Park Cty. Bd. of Cty. Comm'rs*, 2008 WY 88, ¶ 6, 189 P.3d 260, 262 (Wyo.2008) (quoting *Halliburton Energy Services, Inc. v. Gunter*, 2007 WY 151, ¶ 10, 167 P.3d 645, 649 (Wyo.2007)) ("The existence of standing is a legal issue that we review *de novo*.").

[¶ 17] Constitutional challenges present issues of law that we likewise review *de novo*. *Sanderson v. State*, 2007 WY 127, ¶ 31, 165 P.3d 83, 92 (Wyo.2007); *Rutti v. State*, 2004 WY 133, ¶ 9, 100 P.3d 394, 400 (Wyo.2004).

[¶ 18] Actions for injunctive relief are by nature requests for equitable relief within the district court's discretion. *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 10, 215 P.3d 1054, 1058 (Wyo.2009); *In re Kite Ranch, LLC v. Powell Family of Yakima, LLC*, 2008 WY 39, ¶ 21, 181 P.3d 920, 926 (Wyo.2008). Because the district court's decision is discretionary, we review its decision for an abuse of discretion, keeping in mind that an injunction "is an extreme remedy and the court should 'proceed with caution and deliberation before exercising the remedy.'" *Kite Ranch*, ¶ 21, 181 P.3d at 926 (quoting *Rialto Theatre, Inc. v. Commonwealth Theatres, Inc.*, 714 P.2d 328, 332 (Wyo.1986)). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Wilson v. Lucerne Canal &*

*Power Co.*, 2003 WY 126, ¶ 11, 77 P.3d 412, 416 (Wyo.2003) (quoting *Pasenelli v. Pasenelli*, 2002 WY 159, ¶ 11, 57 P.3d 324, 329 (Wyo.2002)).

[¶ 19] In evaluating a court's exercise of discretion in the grant or denial of injunctive relief, this Court has observed:

> In *Kincheloe v. Milatzo*, Wyo., 678 P.2d 855, 861 (1984), we said:
>
>> "Preliminarily, it is to be remembered that, when courts are called upon to employ their injunctive authority, they must utilize this power with great caution. We have said:
>>
>>> "'The extraordinary remedy of an injunction is a far-reaching force and must not be indulged in under hastily contrived conditions. It is a delicate judicial power and a court must proceed with caution and deliberation before exercising the remedy.' *Simpson v. Petroleum, Inc.*, Wyo., 548 P.2d 1, 3 (1976).
>>
>> "Injunctions are extraordinary remedies and are not granted as of right. In granting an injunction, the court exercises broad, equitable jurisdiction. *Brown v. J.C. Penney Co.*, D.C.Wyo., 54 F.Supp. 488 (1943). This discretion is, however, not unfettered, but 'must be exercised reasonably and in harmony with well established principles.' 43 C.J.S. Injunctions § 14 p. 772."

*In re Adoption of RHA*, 702 P.2d 1259, 1266 (Wyo.1985).

## DISCUSSION

### I. MOOTNESS

[¶ 20] The Town contends that OSA's appeal should be dismissed as moot because the event in which OSA desired to demonstrate has already occurred and the TRO has expired. Thus, the Town reasons, a decision by this Court can have no effect on the controversy and the matter is moot. We disagree. Because the present controversy is one of great public importance and is capable of repetition yet evading review, we conclude that OSA's appeal is not moot.

[¶ 21] The doctrine of mootness considers whether a justiciable controversy remains between the parties. *In re Guardianship of MEO*, 2006 WY 87, ¶ 27, 138 P.3d 1145, 1153 (Wyo.2006). "A court should not hear a case where there has been a change in circumstances occurring either before or after a case has been filed that eliminates the controversy." *Id.* (quoting *Southwestern Pub. Serv. Co. v. Thunder Basin Coal Co.*, 978 P.2d 1138, 1143 (Wyo.1999)). We have explained:

> The doctrine of mootness encompasses those circumstances which destroy a previously justiciable controversy. This doctrine represents the time element of standing by requiring that the interests of the parties which were originally sufficient to confer standing persist throughout the duration of the suit. Thus, the central question in a mootness case is "whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties."

*MEO*, ¶ 27, 138 P.3d at 1153–54 (quoting *Southwestern Pub. Serv. Co.*, 978 P.2d at 1143); *see also In re AJ*, 736 P.2d 721, 723 (Wyo.1987) ("Courts do not sit for the purpose of expounding the law upon abstract questions, but to determine the rights of litigants by the rendition of effective judgment.").

[¶ 22] The rule that a case must be dismissed when it becomes moot is not absolute. If a case presents an issue of great public importance or interest, we may rule on the issue even if the dispute is technically moot. *Merchant v. Wyo. Dep't of Corrections*, 2007 WY 159, ¶ 17, 168 P.3d 856, 863 (Wyo.2007); *Bd. of Trustees of Fremont Cty. Sch. Dist. No. 25 v. BM*, 2006 WY 23, ¶ 3, 129 P.3d 317, 319 (Wyo.2006); *In re RM*, 2004 WY 162, ¶ 8, 102 P.3d 868, 871 (Wyo.2004). Likewise, we have ruled on matters, otherwise moot, where we deemed it necessary to provide guidance to state agencies and to produce uniformity in the decisions of the district courts, pursuant to our "general superintending control" of all district courts. *Morad v. Wyo. Highway Dep't*, 66 Wyo. 12, 21, 203 P.2d 954, 957 (1949) (reviewing drivers license revocation after license reinstated); *see also RM*, ¶ 8, 102 P.3d at 871 ("[T]his action presents this court with the opportunity to consider the constitution in a manner not considered before and is of sufficient importance to warrant a full discussion."); *Wyo. Dep't of Revenue & Taxation v. Andrews*, 671 P.2d 1239, 1245 (Wyo.1983) (reviewing moot drivers license suspension because it raised "a significant question of public interest and importance which could be of a continuing nature, and because of its importance with respect to the enforcement of this state's motor vehicle code"). We have stated:

> In *Wyoming Bd. of Outfitters and Professional Guides v. Clark*, 2002 WY 24, ¶ 15, 39 P.3d 1106, 1109 (Wyo.2002), we dismissed an appeal for mootness where a present ruling could have no effect upon a professional license whose temporal life had passed. Certainly the same could be said here, where a license to practice clinical social work from 2000 to 2002 "would be of no practical value to" the appellant. *See Walker v. Board of County Com'rs, Albany County*, 644 P.2d 772, 773–74 (Wyo.1982) ("[a] cause will not be considered when a judgment rendered cannot be carried into effect."). We do not, however, follow this rule blindly and will, despite mootness caused by the passage of time, consider issues that may continue to arise or are of special significance. *Lineberger v. Wyoming State Bd. of Outfitters and Professional Guides*, 2002 WY 55, ¶ 1, 44 P.3d 56, 57 (Wyo.2002) (authority of Board to impose conditions on a license); *Andrews*, 671 P.2d at 1244–45 (questions of sufficient public interest and of a continuing nature).
>
> We find the instant case to be similar to *Lineberger* and *Andrews*. In particular, the issues of whether an expert must establish the standard of care, and whether notice may be accomplished through the State's disclosure statement, have broad application beyond the specific facts of this case and are worthy of being addressed. Furthermore, licensing issues are peculiarly likely to evade judicial review due to their temporal nature. We will not, therefore, dismiss this appeal despite the fact

that the issues could, technically, be moot. Instead, we will address the issues raised by the parties.

*Penny v. Wyo. Mental Health Professions Licensing Bd.,* 2005 WY 117, ¶¶ 3–4, 120 P.3d 152, 157 (Wyo.2005).

[¶ 23] An additional exception applies to disputes that by their nature may conclude before this Court has an opportunity to rule. If a case presents a "controversy capable of repetition yet evading review," we may rule on the matter despite its technical mootness. *Merchant,* ¶ 17, 168 P.3d at 863; *MEO,* ¶ 28, 138 P.3d at 1154; *BM,* ¶ 3, 129 P.3d at 319.

[¶ 24] Our mootness exceptions illustrate that Wyoming's mootness doctrine, like that of many other states, is prudential rather than constitutionally based. *See* Matthew I. Hall, *The Partially Prudential Doctrine of Mootness,* 77 Geo. Wash. L.Rev. 562, 567 n. 14 (2009) ("State courts, whose jurisdiction is not, of course, governed by Article III, are similarly reluctant to hear moot cases, but generally treat their mootness doctrines as prudential, and will hear moot cases when the public interest warrants."); *see also* Robert B. Keiter, Tim Newcomb, *The Wyoming State Constitution: A Reference Guide* 141 (2011) ("Significantly, this section [Article 5, Section 2 of the Wyoming Constitution]—unlike Article III in the U.S. Constitution—does not limit the Wyoming Supreme Court's appellate jurisdiction to 'cases' or 'controversies.' "). Consistent with the differences between federal court authority to decide matters and the authority of this Court, we have developed a body of case law governing justiciability that is independent of federal requirements. *See William F. West Ranch, LLC v. Tyrrell,* 2009 WY 62, ¶ 12 n. 2, 206 P.3d 722, 727 n. 2 (Wyo.2009). Thus, while we may look to federal case law for guidance, and our law is similar to federal precedent in many respects, that federal case law is not binding on this Court. *Id.*

### A. *Matter of Great Public Importance*

[¶ 25] Whether a case presents a question of great importance is a determination to be made by this Court. *RM,* ¶ 8, 102 P.3d at 871; *Jolley v. State Loan and Inv.*

*Bd.,* 2002 WY 7, ¶ 10, 38 P.3d 1073, 1078 (Wyo.2002); *Brimmer v. Thomson,* 521 P.2d 574, 578 (Wyo.1974). We have stated:

> This exception must be applied with caution and its exercise must be a matter where strict standards are applied to avoid the temptation to apply the judge's own beliefs and philosophies to a determination of what questions are of great public importance.

*Jolley,* ¶ 10, 38 P.3d at 1078 (quoting *Brimmer,* 521 P.2d at 578).

[¶ 26] That the case before us is one that presents an issue of great public importance and interest is a determination readily made without reference to personal beliefs or philosophies. As a starting point, the case concerns a fundamental constitutional right, the First Amendment right to free speech. *See RM,* ¶ 8, 102 P.3d at 871 (addressing fundamental right to education as issue of great public importance in an otherwise moot student expulsion case); *Brimmer,* 521 P.2d at 578 (addressing fundamental right to vote as issue of great public importance). Moreover, the constitutional issue is presented in the context of a topic that is of public interest and importance on both a national level and local level, that is, the topic of abortion rights.

[¶ 27] Among the issues in the United States today that are divisive and inflammatory, none is so hotly debated as that of abortion. On the national stage, the issue is front and center in the halls of Congress, on the political campaign trail, and in many state legislatures. *See* Leigh Ann Caldwell, *Democrats Attack Romney for Saying He Wanted to "Get Rid" of Planned Parenthood,* CBS News Political Hotsheet (March 14, 2012); Lucy Madson, *Virginia Gov. Bob McDonnell Signs Virginia Ultrasound Bill,* CBS News Political Hotsheet (March 7, 2012) (Virginia bill requiring women to undergo transvaginal ultrasound prior to having abortion "sparked national debate this month"); Stephanie Condon, *Abortion Funding Showdown Escalates,* CBS News Political Hotsheet (Feb. 8, 2011). On the Wyoming stage, the issue continues to attract attention in the state legislature and in the state capitol

building. *See* Joan Barron, *WyWatch Sues Wyoming Over Anti–Abortion Display,* http://trib.com (Jan. 5, 2012); *Abortion Bill Fails in Wyoming Senate,* http://trib.com (Feb. 26, 2011); Ben Neary, *Wyoming House Rejects Abortion Bill,* http://trib.com (Jan. 26, 2011). Indeed, contending that the abortion issue is not one of great public interest and importance is as unsupportable as contending that the Earth is flat or the sun rises in the west and sets in the east.

[¶ 28] The issue of abortion has polarized mainstream political parties and energized all manner of public interest groups who align with pro-life advocates on the one side and pro-choice advocates on the other. Each side seeks to influence public opinion and to attain legal support for its position—in legislative halls and in the courts. The debate is ubiquitous and abundant. The topic of abortion incites like no other issue in this country today. It divides the nation, our religions, our families, our politics, and our society. The issue arouses deep passions that find full expression in open and public debate that gives all participants the satisfaction of a fair and full hearing.

[¶ 29] Without resort to personal beliefs or philosophies, the case presently before this Court presents issues of great public interest and importance. They are issues that deserve a ruling from this Court.

**B. *Capable of Repetition Yet Evading Review***

██ [¶ 30] In addition to finding this case reviewable under the foregoing exception to mootness, we also find this dispute to be one that is "capable of repetition, yet evading review." Under the "capable of repetition, yet evading review" exception to mootness, two requirements must be met: "First, the duration of the challenged action must be too short for completion of litigation prior to its cessation or expiration. Second, there must be a reasonable expectation that the same complaining party will be subjected to the same action again." *MEO,* ¶ 28, 138 P.3d at 1154 (quoting *Grant v. Meyer,* 828 F.2d 1446, 1449 (10th Cir.1987)).

██ [¶ 31] In this case, there can be little question that the first requirement is met. The TRO expired within twenty-one hours of its issuance, and a temporary restraining order by rule must expire within ten days. *See* W.R.C.P. 65(b). As the Texas Supreme Court explained, temporary restraining orders that impose prior restraints on free speech at planned events are by nature short-lived and evade review. *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 209 (Tex.1981). It is likely that if the controversy were to arise again, an order would issue, the event would pass, and the order would expire, again concluding the controversy before full litigation of the matter could run its course.

[¶ 32] The second prong of the test considers whether a reasonable expectation exists that the same complaining party will be subjected to the same action again. The United States Supreme Court has in some circumstances held that the burden is on the party asserting mootness to "establish that there is no reasonable likelihood that the wrong will be repeated." *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 72, 104 S.Ct. 373, 375, 78 L.Ed.2d 58 (1983); *see also Wilkinson v. Forst,* 591 F.Supp. 403, 410 (D.Conn.1984) (defendant failed to meet mootness burden in challenge to expired court order requiring weapons search of persons attending KKK rally where defendant failed to show no reasonable likelihood of additional rallies). In other cases, the Supreme Court has placed the burden on the party asserting a live controversy to make the required showing. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983) (plaintiff must show "he will again be subjected to the alleged illegality").

[¶ 33] In either allocation of the burden of proof, the Court's decisions have varied on what is required to show that a dispute is capable of repetition:

> We believe the dissent overstates the stringency of the "capable of repetition" test. Although Justice SCALIA equates "reasonable expectation" with "demonstrated probability," the very case he cites for this proposition described these stan-

dards in the disjunctive, see *Murphy v. Hunt*, 455 U.S. [478], at 482, 102 S.Ct. [1181], at 1183, 1184 ("[T]here must be a 'reasonable expectation' *or* a 'demonstrated probability' that the same controversy will recur" (emphasis added)), and in numerous cases decided both before and since *Hunt* we have found controversies capable of repetition based on expectations that, while reasonable, were hardly demonstrably probable. See, *e.g.*, *Burlington Northern R. Co. v. Maintenance of Way Employ[e]es*, 481 U.S. 429, 436, n. 4, 107 S.Ct. 1841, 1846, n. 4, 95 L.Ed.2d 381 (1987) (parties "reasonably likely" to find themselves in future disputes over collective-bargaining agreement); *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 578, 107 S.Ct. 1419, 1424, 94 L.Ed.2d 577 (1987) (O'CONNOR, J.) ("likely" that respondent would again submit mining plans that would trigger contested state permit requirement); *Press–Enterprise Co. v. Superior Court of Cal., Riverside County*, 478 U.S. 1, 6, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) ("It can reasonably be assumed" that newspaper publisher will be subjected to similar closure order in the future); *Globe Newspaper Co. v. Superior Court of Norfolk County*, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982) (same); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 398, 100 S.Ct. 1202, 1210, 63 L.Ed.2d 479 (1980) (case not moot where litigant "faces some likelihood of becoming involved in same controversy in the future") (dicta). Our concern in these cases, as in all others involving potentially moot claims, was whether the controversy was *capable* of repetition and not, as the dissent seems to insist, whether the claimant had demonstrated that a recurrence of the dispute was more probable than not.

*Honig v. Doe*, 484 U.S. 305, 319 n. 6, 108 S.Ct. 592, 602 n. 6, 98 L.Ed.2d 686 (1988).

[¶ 34] Our Court has not assigned the burden of proof on this question or established a showing more stringent than the requirement that the record establish a "reasonable expectation" that the dispute is capable of repetition. *See, e.g.*, *MEO*, ¶ 28, 138 P.3d at 1154 (recurrence of dispute "not outside the realm of reasonable possibility"); *Penny*, ¶ 3, 120 P.3d at 157 (issue that "may continue to arise"); *Bd. of Cty. Comm'rs for Sublette Cty. v. Exxon Mobil Corp.*, 2002 WY 151, ¶ 18, 55 P.3d 714, 720 (Wyo.2002) (issue "likely to arise in other cases"); *Andrews*, 671 P.2d at 1245 (question "could be of a continuing nature"). We believe that in this case it would be particularly unfair to place the burden on OSA to make a record that the dispute is capable of repetition, given that the TRO was issued in this matter without notice to OSA or an opportunity for it to be heard. There was simply no point in these proceedings at which OSA could have submitted evidence on the likelihood that this dispute is capable of repetition.

[¶ 35] We are satisfied, based on the evidence in the limited record before this Court, that there is a reasonable expectation this dispute will recur. The affidavit supporting the Town's Petition for the TRO stated that OSA targeted Jackson, Wyoming, with a stated intention to "[s]hut down the last abortionist in Wyoming." The affidavit also reported incidents from which it may be inferred, and from which the Town has argued, that the group intentionally targets children as the audience for its graphic demonstrations. These facts, even without specifically identified OSA plans to again protest in Jackson, establish a reasonable expectation, beyond mere speculation, that OSA will continue its efforts and approach in Jackson, Wyoming. *See Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Dist. of Columbia*, 972 F.2d 365, 370–71 (D.C.Cir. 1992) (finding it unnecessary to have evidence of definite Klan plans to march in the district—mootness exception does not require imminent repetition, and "[w]e are confident that eventually [the KKK] will make its way into the city again").

[¶ 36] On the question of how the Town might respond under the same or similar circumstances, we have no indication it would approach the situation differently. The record contains no evidence, and this Court has received no information, either at oral argument or through additional submissions, that the Town has taken formal steps to adopt measures which would address similar future

occurrences in a content-neutral, constitutionally permissible manner. *See, e.g.,* the cases cited in footnote two of this opinion, describing content-neutral measures a government may take to address concerns like those raised by the Town. Under these circumstances, where the policy debate over abortion continues, where OSA's approach remains the same, and where the Town's approach remains the same, we conclude there is a sufficient likelihood that the controversy will recur. *See, e.g., Grider v. Abramson,* 994 F.Supp. 840, 843 n. 4 (W.D.Ky.1998) (action challenging police procedures at KKK rally not moot even though rally already held where future rallies expected and police procedures remain unchanged).

[¶ 37] The Supreme Court reasoned similarly in the First Amendment case of *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). In that case, a Nebraska state trial judge, to protect a multiple-murder defendant's right to a fair trial, entered a restraining order barring news media from publishing or broadcasting alleged confessions or admissions made by the defendant to law enforcement officers or other third parties other than the news media itself. *Id.* at 542, 96 S.Ct. at 2795. By the time the First Amendment challenge to that order reached the Supreme Court, the defendant had been convicted and the order had expired. The Court nonetheless held that the case was not moot:

> The controversy between the parties to this case is "capable of repetition" in two senses. First, if Simants' conviction is reversed by the Nebraska Supreme Court and a new trial ordered, the District Court may enter another restrictive order to prevent a resurgence of prejudicial publicity before Simants' retrial. Second, the State of Nebraska is a party to this case; the Nebraska Supreme Court's decision authorizes state prosecutors to seek restrictive orders in appropriate cases. The dispute between the State and the petitioners who cover events throughout the State is thus "capable of repetition." Yet, if we decline to address the issues in this case on grounds of mootness, the dispute will evade review, or at least considered plena-

ry review in this Court, since these orders are by nature short-lived. *See, e.g., Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Sosna v. Iowa,* [419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)]; *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969); *Carroll v. Princess Anne,* 393 U.S. 175, 178–179, 89 S.Ct. 347, 350, 21 L.Ed.2d 325 (1968).

*Nebraska Press Ass'n,* 427 U.S. at 546–47, 96 S.Ct. at 2797; *see also Iranian Muslim Org.,* 615 S.W.2d at 209 (because city policy on parade permits remains same and the Iranian protest issue continues, controversy remains viable notwithstanding fact that date and conditions for which parade permits were requested no longer exist).

[¶ 38] The decision in *Nebraska Press Association* demonstrates the Supreme Court's willingness to relax, or dispense with altogether, the requirement that the dispute capable of repetition must involve the same complaining party. As one commentator observed:

> The classic modern application of the capable-of-repetition exception is in an abortion case, such as *Roe v. Wade.* A plaintiff's challenge to a restriction on her right to obtain an abortion is inherently short-lived, and will always be rendered moot by events—either by birth or by termination of the pregnancy—prior to completion of appellate review. Thus, unless an exception were applied, the conventional doctrine would require that a court dismiss the case as moot. As discussed more fully below, however, courts in such cases routinely ignore the second requirement, that there be a reasonable expectation that the same complaining party will again be subjected to the same action. Courts simply apply the capable-of-repetition exception without inquiring as to any expectation of recurrence on the part of the plaintiff. Indeed, federal courts, including the Supreme Court, have repeatedly applied the exception where likely recurrence was shown only as to other members of the public at large.

Hall, *supra*, 77 Geo. Wash. L.Rev. at 579–80 (footnotes omitted).

[¶ 39] Our Court likewise, in considering whether a dispute is likely to recur, has not strictly adhered to the requirement that it be the same complaining party who may be subjected to the same action again. *See Merchant*, ¶ 17, 168 P.3d at 863 (considering otherwise moot equal protection claim based on "significant potential for this controversy to arise again and affect other Wyoming prisoners"); *Exxon Mobil*, ¶ 18, 55 P.3d at 720 (central issue of administrative appeal by a county "likely to arise in other cases, and would evade review if we determined that the case was moot"). As noted above, we find the record supports a reasonable expectation that the dispute between OSA and the Town will be repeated. In the absence of the same dispute between the same parties, however, we nonetheless believe this is a dispute that will recur, and regardless of the parties to that dispute, it will present the same fundamental legal issues for review.

[¶ 40] This case presents not only a dispute that is capable of repetition and evading review, but also a question of great public importance. It concerns the constitutional right of free speech and presents itself in the context of a policy debate of significant and continuing public interest. Under these circumstances, we hold that the case is not moot and is one on which this Court has the power to rule and should rule. *See Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 179, 89 S.Ct. 347, 350, 21 L.Ed.2d 325 (1968) (case not mooted by expiration of ten-day order given that white supremacist protests continued and question persisted "whether, by what processes, and to what extent the authorities of the local governments may restrict petitioners in their rallies and public meetings").

## II. APPEALABILITY OF *TRO*

[¶ 41] The Town argues as an additional basis to dispose of OSA's appeal that a temporary restraining order is not an appealable order. In support of this argument, it cites to a Colorado case reasoning that such orders are of "short duration and terminate with the ruling of the preliminary injunction

so that an immediate appeal is not necessary to protect the rights of the parties." *See O'Connell v. Colorado State Bank*, 633 P.2d 511, 513 (Colo.App.1981). We find this rationale unpersuasive under the present facts and reject the Town's suggestion that the TRO is not an appealable order.

[¶ 42] Rule 1.05 of the Wyoming Rules of Appellate Procedure defines an appealable order as:

> (a) An order affecting a substantial right in an action, when such order, in effect, determines the action and prevents a judgment; or
>
> \* \* \* \*
>
> (e) Interlocutory orders and decrees of the district courts which:
>
> > (1) Grant, continue, or modify injunctions, or dissolve injunctions, or refuse to dissolve or modify injunctions[.]

W.R.A.P. 1.05. Consistent with Rule 1.05, this Court has held that "[g]enerally a judgment or order which determines the merits of the controversy and leaves nothing for future consideration is final and appealable." *Pub. Serv. Comm'n v. Lower Valley Power & Light, Inc.*, 608 P.2d 660, 661 (Wyo.1980); *see also Goodman v. Voss*, 2011 WY 33, ¶ 22, 248 P.3d 1120, 1126 (Wyo.2011) (order final and appealable where merits of controversy determined).

[¶ 43] The Seventh Circuit Court of Appeals addressed a similar circumstance when it was presented with an appeal from a temporary restraining order enjoining the holding of a Roman Catholic mass during a municipal festival. *Doe v. Village of Crestwood*, 917 F.2d 1476 (7th Cir.1990). The Seventh Circuit found the order appealable, explaining:

> Although 28 U.S.C. § 1292(a)(1) does not authorize appeals from temporary restraining orders, *San Francisco Real Estate Investors v. Real Estate Investment Trust of America*, 692 F.2d 814, 816 (1st Cir.1982); *Stricklin v. University of Wisconsin*, 420 F.2d 1257, 1259 (7th Cir.1970), the order forbidding the observance of mass is not properly characterized as a "temporary" restraint. Drawing a line between appealable preliminary injunctions

and non-appealable TROs makes sense when the TRO holds things in stasis to facilitate an orderly decision. Appellate consideration of such an interim step might disrupt the review the order was supposed to permit, and TROs are so short in duration that an appeal commonly could not be completed before their expiration. Better to allow things to proceed in the district court than to fight at length about the brief interlude until a decision may be rendered on the merits. Nomenclature does not determine whether an order is a preliminary injunction, however, *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987); *Sampson v. Murray*, 415 U.S. 61, 86–88, 94 S.Ct. 937, 951–52, 39 L.Ed.2d 166 (1974), and the name attached to this order is imprecise. It does not create a little delay pending decision. Rather it forbids the mass, which will not be rescheduled. No further proceedings in the district court concerning this mass are in prospect. All questions concerning the 1990 festival have been wrapped up, leaving only the plaintiff's request for an injunction against recurrence. This order is an "injunction" within the meaning of § 1292(a)(1), and the notice of appeal therefore invokes our jurisdiction. *Belknap v. Leary*, 427 F.2d 496, 498 (2d Cir. 1970); see also Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, 16 *Federal Practice and Procedure* § 3922 (1977 & 1990 Supp.) (collecting cases).

*Id.* at 1477.

[¶ 44] We understand that the grant or denial of a temporary restraining order may not be a final order in the context of on-going litigation. Under those circumstances, both parties would have a further opportunity to be heard at the preliminary injunction stage of proceedings, and the record would likely be better developed for review. In this case, however, there was no on-going litigation. This action began with the ex parte Petition and ended with the issuance of the ex parte TRO, and the TRO is therefore a final appealable order. *See Populist Party v. Herschler*, 746 F.2d 656, 661 n. 2 (10th Cir.1984)

(temporary restraining order is appealable when acts as a final order).

## III. REMAINING JURISDICTIONAL ISSUES

[¶ 45] The remaining jurisdictional issues have been raised by OSA as challenges to the district court's original jurisdiction to issue the TRO. OSA contests the standing of the Town to seek a TRO, as well as the district court's subject matter and personal jurisdiction.

### A. *Town's Standing to Seek TRO*

[¶ 46] OSA asserts that the Town did not have, or even allege, a tangible interest in this matter sufficient to confer standing to bring its Petition, and that the proper plaintiff in this action would have been a parent or guardian of one of the potentially impacted children. We disagree.

[¶ 47] "Standing is a legal concept designed to determine whether a party is sufficiently affected to insure that the court is presented with a justiciable controversy." *In re Guardianship of Parkhurst*, 2010 WY 155, ¶ 10, 243 P.3d 961, 965 (Wyo.2010) (quoting *In re Adoption of CF*, 2005 WY 118, ¶ 39, 120 P.3d 992, 1004–05 (Wyo.2005)). This Court has described the standing doctrine and its requirements as follows:

"The doctrine of standing is a jurisprudential rule of jurisdictional magnitude. At its most elementary level, the standing doctrine holds that a decision-making body should refrain from considering issues in which the litigants have little or no interest in vigorously advocating. Accordingly, the doctrine of standing focuses upon whether a litigant is properly situated to assert an issue for judicial or quasi-judicial determination. A litigant is said to have standing when he has a 'personal stake in the outcome of the controversy.' This personal stake requirement has been described in Wyoming as a 'tangible interest' at stake. The tangible interest requirement guarantees that a litigant is sufficiently interested in a case to present a justiciable controversy."

*Parkhurst*, ¶ 10, 243 P.3d at 965 (quoting *CF*, ¶ 39, 120 P.3d at 1004–05).

[¶ 48] The Town filed its Petition out of concern for the welfare of approximately two-hundred Boy Scouts aged seven to fourteen. Government has long been recognized as having a compelling interest in the well being of its youth. *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989); *Ginsberg v. State of New York*, 390 U.S. 629, 638–39, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). This interest of the Town is expressly recognized by its statutory authority. By statute, a town may sue or be sued, and it may "[r]egulate, prevent or suppress riots, disturbances, disorderly assemblies or parades, or any other conduct which disturbs or jeopardizes the public health, safety, peace or morality, in any public or private place." Wyo. Stat. Ann. § 15-1-103(a)(xviii) (LexisNexis 2011).

[¶ 49] We conclude that the Town's asserted interest in protecting its youth gave it a sufficient stake in the outcome of these proceedings to allow it standing to bring its Petition.

## B. *Subject Matter Jurisdiction*

[17] [¶ 50] OSA contends that the district court lacked subject matter jurisdiction to rule on the Petition because the Town did not file a complaint invoking the court's jurisdiction before it filed its Petition requesting the TRO. We conclude that the filing of a complaint is not an essential predicate to a petition or motion for a temporary restraining order and thus reject this jurisdictional challenge.

[¶ 51] The appropriate procedure for seeking a temporary restraining order has been described by one prominent authority as follows:

> The appropriate procedure for requesting a preliminary injunction is by motion, although it also commonly is requested by an order to show cause. As indicated in Rule 7, the motion should describe the preliminary injunction sought and state with particularity the grounds for granting it. The motion may be part of the written notice of the hearing on the preliminary injunction. As was observed by Judge Tuttle in an analogous context: "The grant

of a temporary injunction need not await any procedural steps perfecting the pleadings or any other formality attendant upon a full-blown trial of this case." Indeed, although it is preferable to file the complaint first, a preliminary injunction may be granted upon a motion made before a formal complaint is presented.

11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, *Federal Practice and Procedure* § 2949 (2d ed. 2011) (footnotes omitted).

[¶ 52] We agree that while the better practice would be to have a complaint on file before a motion or petition for temporary restraining order is submitted, the lack of a complaint does not deprive the district court of jurisdiction to act. *See Studebaker Corp. v. Gittlin*, 360 F.2d 692, 694 (2nd Cir.1966) (although it would have been better to file a complaint along with motion and affidavit, court could treat affidavit as complaint); *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F.Supp. 1349, 1352 (N.D.Tex.1991) (exigent circumstances allow injunction to precede filing of suit); *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 608 F.Supp. 945, 950 n. 5 (N.D.Cal.1985) ("Owing to the peculiar function of the preliminary injunction, it is not necessary that the pleadings be perfected, or even that a complaint be filed, before the order issues.").

## C. *Personal Jurisdiction*

[¶ 53] As its final jurisdictional argument, OSA asserts the TRO is void because the district court did not have personal jurisdiction over it. We find that OSA waived any objection to personal jurisdiction and therefore also reject this challenge to the district court's jurisdiction.

[¶ 54] This Court has held as follows concerning personal jurisdiction and its effect on a court's judgment:

> In order for a court to acquire jurisdiction over a defendant, that defendant must be properly served or must "voluntarily" appear. A judgment entered without the court having jurisdiction is null and void. A defendant may waive his right to challenge a court's jurisdiction. Such a chal-

lenge should be made at the defendant's soonest opportunity. Failure to timely broach the issue with the court may result in waiver of that defense. Most importantly for this case, where a defendant appears voluntarily, without questioning the court's personal jurisdiction, that appearance is the equivalent of proper service of process. *Matter of Adoption of MSVW*, 965 P.2d 1158, 1162 (Wyo.1998); and see *Ostermiller v. Spurr*, 968 P.2d 940, 943 (Wyo.1998) (consent to court's jurisdiction for one purpose may result in court's jurisdiction for any related purpose). *JAG v. State Dep't of Family Servs.*, 2002 WY 158, ¶ 13, 56 P.3d 1016, 1019 (Wyo.2002); *see also Walton v. State ex rel. Wood*, 2002 WY 108, ¶ 10, 50 P.3d 693, 697 (Wyo.2002) (failure to question personal jurisdiction at earliest opportunity deemed a waiver); *CRB v. State*, 974 P.2d 931, 936 (Wyo.1999) (party must assert lack of personal jurisdiction by W.R.C.P. 12(b) motion or its equivalent).

[¶ 55] OSA did not file a motion to dismiss the Petition. Instead, it filed a Notice of Appeal and entered an appearance through its counsel. OSA then filed a brief with this Court, in which it requested a remand to district court for consideration of an affirmative award of damages against the Town. With these actions, OSA waived any objection to personal jurisdiction and submitted itself to the jurisdiction of the court. *See In re Adoption of MSVW*, 965 P.2d 1158, 1162 (Wyo.1998) ("When a defendant voluntarily appears without questioning the court's personal jurisdiction over him, his appearance is the equivalent of proper service of process."); *Cotton v. Brow*, 903 P.2d 530, 531 (Wyo.1995) (defendant's filing of brief on appeal affirmatively invoked jurisdiction of court); *Weber v. Johnston Fuel Liners, Inc.*, 519 P.2d 972, 977–78 (Wyo.1974) (defendant waived objection to personal jurisdiction when he sought damages as affirmative relief).

## IV. FREE SPEECH INFRINGEMENT

[¶ 56] We turn next to OSA's contention that the TRO violated its free speech rights guaranteed by the First Amendment to the United States Constitution.[1]

### A. First Amendment Protections

[¶ 57] The First Amendment "reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, —— U.S. ——, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quoting *Ashcroft v. A.C.L.U.*, 535 U.S. 564, 573, 122 S.Ct. 1700, 1707, 152 L.Ed.2d 771 (2002)); *see also Brown v. Entertainment Merchants Ass'n*, —— U.S. ——, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011). Its general protections are not, however, absolute. *Ashcroft*, 535 U.S. at 573, 122 S.Ct. at 1707.

[¶ 58] Through its numerous decisions interpreting First Amendment protections, the United States Supreme Court has outlined the required considerations for determining whether a government restriction on speech is permissible. That determination turns on the type of restraint, the type of speech, the forum in which the speech is restrained, and the nature of the restriction, that is, whether

---

1. OSA also challenges the TRO under Article 1, § 21 of the Wyoming Constitution and the Fifth Amendment to the United States Constitution. It provides no legal argument or authority with respect to its Fifth Amendment claim, and we thus will not address that claim. OSA likewise does not provide a separate legal analysis of how the Wyoming provision might dictate an outcome that differs from that provided by application of the First Amendment. This Court will not, as a matter of policy, consider a state constitutional claim in the absence of a sufficient argument supporting "adequate and independent state grounds." *Cohen v. State*, 2008 WY 78, ¶ 23, 191 P.3d 956, 962 (Wyo.2008); *Rideout v. State*, 2005 WY 141, ¶ 15, 122 P.3d 201, 205 (Wyo.2005); *Cotton v. State*, 2005 WY 115, ¶ 14, 119 P.3d 931, 934 (Wyo.2005); *Vassar v. State*, 2004 WY 125, ¶ 14, 99 P.3d 987, 993 (Wyo.2004). Accordingly, we will confine our analysis of OSA's claims to the First Amendment.

it is content-neutral or content-based. *See, e.g., Stevens,* 130 S.Ct. at 1584–85 (type of speech); *Pleasant Grove City v. Summum,* 555 U.S. 460, 469–70, 129 S.Ct. 1125, 1132, 172 L.Ed.2d 853 (2009) (type of forum); *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 2524–25, 129 L.Ed.2d 593 (1994) (type of restraint); *Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 134–35, 112 S.Ct. 2395, 2403–04, 120 L.Ed.2d 101 (1992) (content regulation).

[¶ 59] These considerations dictate the level of scrutiny that must be used in determining whether a government restriction on speech is constitutional, and we thus consider each in turn as they apply to the TRO issued in this case.

## B. *Application of Scrutiny Factors to TRO*

### 1. *Type of Restriction: Prior Restraint*

■■■■■ [¶ 60] The term prior restraint is used to describe "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993) (quoting M. Nimmer, *Nimmer on Freedom of Speech* § 4.03 at 4–14 (1984)). A temporary restraining order is a classic example of a prior restraint. *Id.*

■■■ [¶ 61] The Supreme Court has described prior restraints on speech as "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n,* 427 U.S. at 559, 96 S.Ct. at 2803. Any prior restraint on expression bears "a heavy presumption against its constitutional validity." *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *see also CBS, Inc. v. Davis,* 510 U.S. 1315, 1317, 114 S.Ct. 912, 914, 127 L.Ed.2d 358 (1994); *Forsyth County,* 505 U.S. at 130, 112 S.Ct. at 2401; *Vance v. Universal Amusement Co., Inc.,* 445 U.S. 308, 316 n. 13, 100 S.Ct. 1156, 1161 n. 13, 63 L.Ed.2d 413 (1980).

[¶ 62] The Supreme Court has explained the presumption against the validity of prior restraints, and the preference for other restrictions:

> The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Vance,* 445 U.S. at 316 n. 13, 100 S.Ct. at 1161 n. 13 (citations omitted). Along these lines, the Court has further commented:

> A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative.
>
> A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time.

*Nebraska Press Ass'n,* 427 U.S. at 559, 96 S.Ct. at 2803 (footnote omitted); *see also Madsen,* 512 U.S. at 764, 114 S.Ct. at 2524 (injunctions carry greater risk of censorship and discrimination than do ordinances).

[¶ 63] The TRO issued in this case acted as a prior restraint on OSA's speech, and there is thus a heavy presumption against its constitutionality.

### 2. *Type of Speech: Public Issue Speech*

■■■■ [¶ 64] The First Amendment does not offer all speech the same degree of protection. *Garcetti v. Ceballos,* 547 U.S. 410, 444–45, 126 S.Ct. 1951, 1973, 164 L.Ed.2d 689 (2006) (Breyer, J., dissenting). The degree of protection differs depending on whether the speech is political inter-

est/public issue speech, commercial speech or government speech. *Id.* Additionally, certain categories of speech are afforded limited or no protection, such as obscenity, fighting words, defamation, and fraud. *Stevens,* 130 S.Ct. at 1584.

[¶ 65] Speech on public issues or matters of public concern "are classic forms of speech that lie at the heart of the First Amendment." *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 377, 117 S.Ct. 855, 867, 137 L.Ed.2d 1 (1997). The Supreme Court has consistently observed the central importance of protecting speech on public issues, which has led it to scrutinize carefully any restrictions on public issue picketing. *Boos,* 485 U.S. at 318, 108 S.Ct. at 1162; *United States v. Grace,* 461 U.S. 171, 180–81, 103 S.Ct. 1702, 1708–09, 75 L.Ed.2d 736 (1983); *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

[¶ 66] Speech directed at abortion policy is public issue speech. *See Hill v. Colorado,* 530 U.S. 703, 714–15, 120 S.Ct. 2480, 2488–89, 147 L.Ed.2d 597 (2000); *Schenck,* 519 U.S. at 377, 117 S.Ct. at 867; *Madsen,* 512 U.S. at 762–64, 114 S.Ct. at 2523–25. "The fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection." *Hill,* 530 U.S. at 715, 120 S.Ct. at 2488–89. "As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.'" *Boos,* 485 U.S. at 322, 108 S.Ct. at 1164 (quoting *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988)).

[¶ 67] OSA's speech is protected public issue speech, and based on these precedents, any restriction on that speech must be carefully scrutinized. We find that this level of protection must likewise be extended to the graphic photographs OSA chooses to use in its demonstrations. The Supreme Court has stated it will not expand the categories of speech that receive limited protec-

tion, such as obscenity, unless there is a demonstration of a longstanding American tradition forbidding such speech or expressive conduct. *Stevens,* 130 S.Ct. at 1585. In *Stevens,* a 2010 decision, the Court declined to decrease the level of protection to be given depictions of animal cruelty. *Id.* Even more recently, in 2011, the Court rejected an argument for decreased protection of video games available commercially to young children that contain violent images, including sexual assault and murder. *Brown,* 131 S.Ct. at 2734. The *Stevens* Court explained:

> The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document "prescribing limits, and declaring that those limits may be passed at pleasure."

*Stevens,* 130 S.Ct. at 1585 (quoting *Marbury v. Madison,* 1 Cranch 137, 178, 2 L.Ed. 60 (1803)).

### 3. *Forum Analysis: Traditional Public Forum*

[¶ 68] Streets, sidewalks and parks have long been held to be the traditional fora for First Amendment protected speech, and government entities are strictly limited in their ability to restrict speech in those areas.

> This Court long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, "which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (quoting *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)

(opinion of Roberts, J.)). In order to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in such "traditional public fora." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Reasonable time, place, and manner restrictions are allowed, see *Perry Ed. Assn., supra*, at 45, 103 S.Ct. 948, but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, see *Cornelius, supra*, at 800, 105 S.Ct. 3439, and restrictions based on viewpoint are prohibited, see *Carey v. Brown*, 447 U.S. 455, 463, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

*Pleasant Grove*, 555 U.S. at 469, 129 S.Ct. at 1132.

[¶ 69] The TRO in this case restricted OSA's speech in the Town Square—a park, and on the surrounding streets and sidewalks. The Town nonetheless contends that the TRO did not apply to a traditional public forum because it has enacted a resolution that allows it to issue permits regulating the Town Square's use for larger events. We disagree that the Town's regulation changed, or could change, the nature of the park as a traditional public forum. *See United States v. Marcavage*, 609 F.3d 264, 278 n. 9 (3rd Cir.2010) ("The issuance of a permit to use a public forum does not transform its status as a public forum."); *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998) ("[T]raditional public fora are open for expressive activity regardless of the government's intent.").

[¶ 70] The Town Square and the surrounding streets and sidewalk are traditional public fora, and the TRO's restrictions are therefore subject to the heightened scrutiny applicable to that fora.

### 4. *Nature of Restriction: Content–Based*

[¶ 71] The final consideration in determining the level of scrutiny that must be used in determining the TRO's constitutionality is the nature of the TRO's restriction, that is, whether the TRO is content-neutral or content-based. Content-neutral restrictions are those that are justified without reference to the content of the regulated speech. *Boos*, 485 U.S. at 320, 108 S.Ct. at 1163. A restriction that seeks to protect or shield an audience from disturbing or distressing aspects of speech is content-based. *Id.* at 321, 108 S.Ct. at 1164; *see also Brown*, 131 S.Ct. at 2733–34. Likewise, a restriction that is based on an audience's hostile response to the speech is content-based regulation. *Forsyth County*, 505 U.S. at 134–35, 112 S.Ct. at 2403–04.

[¶ 72] The Town sought the TRO and the district court issued the TRO to protect children from the images contained in OSA's demonstration materials and to address the concern that there may be a hostile response to the OSA demonstrations. The restrictions were thus content-based.

[¶ 73] Because the TRO imposes content-based restrictions on OSA's speech in a traditional public forum, the TRO is subject to strict scrutiny.

> Because the Act imposes a restriction on the content of protected speech, it is invalid unless [the government] can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest. *R.A.V.* [*v. City of St. Paul*], 505 U.S. [377], at 395, 112 S.Ct. 2538, [120 L.Ed.2d 305 (1992)]. The State must specifically identify an "actual problem" in need of solving, [*United States v.*] *Playboy* [*Entertainment Group, Inc.*], 529 U.S. [803], at 822–823, 120 S.Ct. 1878 [146 L.Ed.2d 865 (2000)], and the curtailment of free speech must be actually necessary to the solution, see *R.A.V., supra*, at 395, 112 S.Ct. 2538. That is a demanding standard. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy, supra*, at 818, 120 S.Ct. 1878.

*Brown*, 131 S.Ct. at 2738.

### C. *Application of Strict Scrutiny to TRO*

[¶ 74] We understand the Town of Jackson faced a difficult situation with the

disturbing materials OSA directed toward audiences of children, and with our decision today, this Court does not intend to be dismissive of the Town's legitimate concerns and efforts to address those concerns in a limited timeframe. Nonetheless, the TRO requested by the Town and issued by the district court imposed a prior restraint on the OSA's public issue speech in a traditional public forum, based on the content of that speech. Any such restriction is presumptively invalid and faces the most demanding level of First Amendment scrutiny. We find the Town did not meet its burden under the First Amendment's rigorous constitutional standards.

[¶ 75] The strict scrutiny level of analysis requires that the restriction on speech be justified by a compelling government interest and be narrowly drawn to serve that interest. *Brown*, 131 S.Ct. at 2738; *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358–59, 129 S.Ct. 1093, 1098, 172 L.Ed.2d 770 (2009); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96, 112 S.Ct. 2538, 2549–50, 120 L.Ed.2d 305 (1992). The government bears the burden of establishing its compelling government interest and that the interest cannot be served in a less restrictive manner. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428–29, 126 S.Ct. 1211, 1219, 163 L.Ed.2d 1017 (2006). The Supreme Court has explained the government's burden as follows:

> When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions. *Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173, 183, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) ("[T]he Government bears the burden of identifying a substantial interest and justifying the challenged restriction"); [*A.C.L.U. v.*] *Reno*, 521 U.S. [844], at 879, 117 S.Ct. 2329[, 138 L.Ed.2d 874 (1997)] ("The breadth of this content-based restriction of speech imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective ..."); *Edenfield v. Fane*, 507 U.S. 761, 770–771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) ("[A] govern-

mental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ("[T]he State bears the burden of justifying its restrictions ..."); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("In order for the State ... to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint"). When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed. "Content-based regulations are presumptively invalid," *R.A.V. v. St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and the Government bears the burden to rebut that presumption.

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816–17, 120 S.Ct. 1878, 1888, 146 L.Ed.2d 865 (2000).

### 1. *Compelling Government Interest*

[¶ 76] The Town cites the need to protect children attending the Boy Scout Elk Fest from disturbing images of aborted and dismembered fetuses as its compelling government interest in support of the TRO. It further asserts an interest in preserving the peace, order, safety and tranquility of the Boy Scout Elk Fest.

[¶ 77] The need to protect the psychological well being of children has been recognized as a compelling government interest. *Sable Communications*, 492 U.S. at 126, 109 S.Ct. at 2836; *Ginsberg*, 390 U.S. at 638, 88 S.Ct. at 1280. The Supreme Court, however, has declared that that interest is not without boundary.

> "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-

defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. Jacksonville,* 422 U.S. 205, 212–213, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (citation omitted). No doubt a State possesses legitimate power to protect children from harm, *Ginsberg, supra,* at 640–641, 88 S.Ct. 1274; *Prince v. Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 88 L.Ed. 645 (1944), but that does not include a free-floating power to restrict the ideas to which children may be exposed. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik,* supra, at 213–214, 95 S.Ct. 2268.

*Brown,* 131 S.Ct. at 2735–36.

[¶ 78] Our concern in the present case is not with the general proposition that protecting youth is a compelling government interest, but is instead with the record. The record contains no evidence concerning the injury or potential injury to children from viewing the images displayed by OSA, and of particular importance in the context of the request for injunctive relief, evidence of irreparable harm to the children. The affidavit of Lt. Gilliam describes the contact OSA had with youth in the community and describes the materials OSA showed to the young audience, but it does not describe how those materials impacted them, or could impact them. In the absence of such evidence, the government has not made its required showing of an "actual problem" in need of solving. *Brown,* 131 S.Ct. at 2738; *Playboy,* 529 U.S. at 816, 120 S.Ct. at 1888.

[¶ 79] We turn then to the Town's concerns with a breach of the peace. While a government does have a recognized interest in maintaining peace in its community and at its events, the Supreme Court has held that this is not a basis to proscribe speech, unless that speech is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Texas v. Johnson,* 491 U.S. 397, 409, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989); *see also Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct.

1827, 1829, 23 L.Ed.2d 430 (1969). The Court has observed:

The State's position, therefore, amounts to a claim that an audience that takes serious offense at particular expression is necessarily likely to disturb the peace and that the expression may be prohibited on this basis. Our precedents do not countenance such a presumption. On the contrary, they recognize that a principal "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). See also *Cox v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. at 508–509, 89 S.Ct. at 737–38; *Coates v. Cincinnati,* 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971); *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55–56, 108 S.Ct. 876, 881–882, 99 L.Ed.2d 41 (1988). It would be odd indeed to conclude *both* that "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection," *FCC v. Pacifica Foundation,* 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978) (opinion of STEVENS, J.), *and* that the government may ban the expression of certain disagreeable ideas on the unsupported presumption that their very disagreeableness will provoke violence.

Thus, we have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (reviewing circumstances surrounding rally and speeches by Ku Klux Klan). To accept Texas' arguments that it need only demonstrate "the potential for a breach of the

peace," Brief for Petitioner 37, and that every flag burning necessarily possesses that potential, would be to eviscerate our holding in *Brandenburg*. This we decline to do.

*Texas*, 491 U.S. at 408–09, 109 S.Ct. at 2542 (footnote omitted).

[¶ 80] The evidence the Town submitted concerning the potential for a breach of peace as a result of the OSA demonstrations was an incident in which a counter-protestor tried to run over an OSA member with his vehicle. Lt. Gilliam's affidavit reported that this individual was arrested and charged. The record contains no evidence that OSA engages in speech that is directed at inciting violence or is likely to produce imminent lawless action, and in the absence of such evidence, we conclude that prohibiting OSA's speech is not supported.

## 2. *Narrow Tailoring*

[¶ 81] Assuming the Town had established a compelling interest in the protection of its youth and in maintaining the peace, we would nonetheless find the TRO unconstitutional. The Town has not met its burden of establishing that the TRO ban was necessary to serve the Town's interest and that less restrictive measures would not have been adequate.

[¶ 82] Our first concern is with the geographical scope of the TRO. It prohibited OSA from displaying its graphic posters not just in the Town Square, but also on the streets and sidewalks two blocks in each direction of the park. This is a broader "buffer zone" than the Supreme Court has approved even when the restriction creating the buffer zone is content-neutral and thus subjected to a less demanding level of scrutiny. *See Schenck*, 519 U.S. 357, 117 S.Ct. 855 (upholding content-neutral buffer zone of fifteen feet from clinic entrance to allow patients to freely enter and exit clinic, but overturning floating fifteen-foot buffer zone around patients as too restrictive of free speech rights); *Madsen*, 512 U.S. at 769–75, 114 S.Ct. at 2527–30 (upholding 36-foot content-neutral buffer zone around clinic, but overturning 300-foot content-neutral buffer zone around staff residences as too broad

even though targeted picketing of personal residences is less protected and the government's interest in protecting the privacy of a residence is an interest of the highest order).

[¶ 83] We find an Eighth Circuit decision holding unconstitutional a content-neutral ordinance that banned protesting within fifty feet of church property thirty minutes before or after scheduled services or events to be instructive. *Olmer v. City of Lincoln*, 192 F.3d 1176 (8th Cir.1999). In that case, the court reasoned as follows:

The question is whether the ordinance is a "narrowly tailored" effort to protect the legitimate interest identified by the District Court. The answer is plainly no. The ordinance purports to make the carrying of signs at the indicated times and places unlawful, no matter what the signs say or depict, and this prohibition is much broader than necessary to protect the psychological interest of young children as found by the District Court. Moreover, the ordinance prohibits communication with adults as well as with children. While most of the adults attending the Westminster Presbyterian Church probably do not like the signs and disagree with them, that is hardly a sufficient basis, under the First Amendment, to justify what the City is attempting to do here. Expressive communication is frequently upsetting, even abrasive. The protection of such robust debate is at the core of the First Amendment. Finally, the ordinance bans certain forms of communication even if all of those to whom it is directed in fact wish to hear it. In sum, the ordinance bans speech directed at adults, and is not narrowly tailored to prohibit only that sort of speech that would be psychologically damaging to children. For further elaboration, see [*Olmer v. City of Lincoln*], 23 F.Supp.2d [1091], at 1100–1102 [ (D.Neb.1998) ].

The City also claims that it has a legitimate interest in preserving the right of its citizens to exercise their religion freely. Such an interest, in the abstract, is undoubtedly substantial and important. If, for example, anti-abortion protestors were to attempt to enter a church without permission, or to interrupt church services

with their own speech, the city could doubtless prosecute them under a general trespass or disturbing-the-peace provision, or, if necessary, adopt a more specific prohibition directed against disturbing or interrupting services of worship. The present ordinance goes way beyond that. It goes beyond the church building and church property, and seeks to forbid peaceful communication on property belonging to the public, even though the communication may be completely truthful, and even though there is absolutely no physical interference with access to the church.

*Olmer*, 192 F.3d at 1180–81.

[¶ 84] As in *Olmer*, the Town has not shown that the breadth of the TRO, prohibiting the displays by the OSA within two blocks in any direction from the Town Square, was necessary to serve the Town's interest of protecting its children from disturbing images. The same is true of the Town's interest in maintaining the peace. The Town has not shown that intervention by law enforcement, as was used in the one instance of violence cited by the Town, is not adequate to maintain the peace. *See Grider v. Abramson*, 994 F.Supp. 840, 845 (W.D.Ky. 1998) (employing police procedures to address concerns of violence between competing rallies).

[¶ 85] In the absence of this required showing, the Town has not met its burden under the strict scrutiny analysis.[2]

## V. RULE 65 NOTICE AND BOND REQUIREMENTS

[¶ 86] As a final matter, we address OSA's contentions that the district court

abused its discretion in issuing the TRO without providing OSA notice and an opportunity to be heard, and without requiring a security bond.

### A. *Notice*

 [¶ 87] Rule 65(b) of the Wyoming Rules of Civil Procedure governs the issuance of temporary restraining orders. It allows the issuance of an order without notice to the adverse party under limited circumstances:

A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if: (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition; and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

W.R.C.P. 65(b).

[¶ 88] The Supreme Court has condemned the issuance of ex parte orders restraining speech, stating:

There is a place in our jurisprudence for ex parte issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to

---

2. The Town has noted that it has the right to impose reasonable time, manner and place restrictions on speech activities in the Town Square. We do not take issue with this statement where such restrictions are imposed in a content-neutral manner. The reasonable time, manner and place restriction analysis does not apply where the restriction at issue is content-based. *Pleasant Grove*, 555 U.S. at 469, 129 S.Ct. at 1132.

 We likewise agree with the Town that it has the right, through the use of content-neutral restrictions and subject to the reasonable time, manner and place requirement, to restrict speech in areas reserved for other uses. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452

U.S. 640, 649–52, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981) (state's interest in protecting the safety and convenience of persons using public forum and need to maintain orderly movement of crowd justified content-neutral, first-come, first-serve process of allocating designated space and limiting dissemination of written materials to that area); *Mosley*, 408 U.S. at 98, 92 S.Ct. at 2292 ("Conflicting demands on the same place may compel the State to make choices among potential users and uses."); *Sanders v. United States*, 518 F.Supp. 728, 730 (D.D.C.1981) (government may impose content-neutral restriction on speech in an area reserved for another use).

serve or to notify the opposing parties and to give them an opportunity to participate. *Carroll*, 393 U.S. at 180, 89 S.Ct. at 351. The Town contends that the present case and *Carroll* are wholly distinct from each other and *Carroll* should therefore not be controlling. In particular, the Town cites the greater amount of time the town in *Carroll* had to respond to the demonstration activities and the length of the injunction that issued. Because of these contentions, we find it helpful to set forth the facts of *Carroll* in some detail to determine whether the case's holding should be applied here.

[¶ 89] In *Carroll*, a white supremacist group held a rally near the courthouse steps in the town of Princess Anne, Maryland. 393 U.S. at 176, 89 S.Ct. at 349. The speeches were described as aggressively and militantly racist and "as both a provocation to the Negroes in the crowd and an incitement to the whites." *Id.* During the speeches, one speaker announced that the rally would continue the next evening, and he called for the audience to return:

> Petitioner Norton said, 'I want you to * * * be back here at the same place tomorrow night, bring every friend you have * * *. We're going to take it easy tonight * * *' and 'You white folks bring your friends, come back tomorrow night. * * * Come on back tomorrow night, let's raise a little bit of hell for the white race.'

*Id.* at 176 n. 1, 89 S.Ct. at 349 n. 1.

[¶ 90] That next day, town officials applied for and received an ex parte restraining order, with no effort to notify or informally communicate with the defendants. *Id.* at 177, 89 S.Ct. at 349. The order restrained the white supremacist group for ten days from holding rallies or meetings in the county "which will tend to disturb and endanger the citizens of the County." *Id.* As a result, the scheduled rally was not held. *Id.* After a trial, the injunction was extended for another ten months. *Id.* A state appellate court reversed the ten-month injunction and upheld the ten-day restraining order, which the group then appealed to the Supreme Court. *Id.* at 177, 89 S.Ct. at 350.

[¶ 91] In reversing entry of the ten-day order for failure to provide the required no-

tice, the Supreme Court explained its concerns with ex parte orders restraining free speech.

> The value of a judicial proceeding, as against self-help by the police, is substantially diluted where the process is ex parte, because the Court does not have available the fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate. The facts in any case involving a public demonstration are difficult to ascertain and even more difficult to evaluate. Judgment as to whether the facts justify the use of the drastic power of injunction necessarily turns on subtle and controversial considerations and upon a delicate assessment of the particular situation in light of legal standards which are inescapably imprecise. In the absence of evidence and argument offered by both sides and of their participation in the formulation of value judgments, there is insufficient assurance of the balanced analysis and careful conclusions which are essential in the area of First Amendment adjudication.
>
> The same is true of the fashioning of the order. An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). In other words, the order must be tailored as precisely as possible to the exact needs of the case. The participation of both sides is necessary for this purpose. Certainly, the failure to invite participation of the party seeking to exercise First Amendment rights reduces the possibility of a narrowly drawn order, and substantially imperils the protection which the Amendment seeks to assure.
>
> ... The issuance of an injunction which aborts a scheduled rally or public meeting, even if the restraint is of short duration, is a matter of importance and consequence in

view of the First Amendment's imperative. The denial of a basic procedural right in these circumstances is not excused by the availability of post-issuance procedure which could not possibly serve to rescue the August 7 meeting, but, at best, could have shortened the period in which petitioners were prevented from holding a rally.

*Carroll,* 393 U.S. at 183–84, 89 S.Ct. at 352–53 (footnotes omitted).

[¶ 92] In finding no factual basis to support the issuance of an ex parte restraining order, the Supreme Court in *Carroll* stated:

> In the present case, the record discloses no reason why petitioners were not notified of the application for injunction. They were apparently present in Princess Anne. They had held a rally there on the night preceding the application for and issuance of the injunction. They were scheduled to have another rally on the very evening of the day when the injunction was issued. And some of them were actually served with the writ of injunction at 6:10 that evening. In these circumstances, there is no justification for the ex parte character of the proceedings in the sensitive area of First Amendment rights.

*Id.* at 182–83, 89 S.Ct. at 352 (footnote omitted).

 [¶ 93] We are unable to discern any reason that the holding in *Carroll* should not apply to this case. The Town's suggestion that the town of Princess Anne had more time to react to the situation and thus provide notice to the defendants is not borne out by the facts of the case or the Supreme Court's analysis of those facts. Nor was the Court's analysis affected by the length of the restraining order. We thus conclude that the rule announced in *Carroll* does apply to this case. That is, a temporary restraining order that operates to restrict free speech rights may only issue ex parte where a "showing is made that it is impossible to

serve or to notify the opposing parties and to give them an opportunity to participate." *See Carroll,* 393 U.S. at 180, 89 S.Ct. at 351.

[¶ 94] In this case, that showing cannot be made. Based on the affidavit of Lieutenant Gilliam, it is apparent that he was in contact with and able to reach members of OSA when necessary. And the Town's Petition does not suggest otherwise. Counsel for the Town did not allege that it was impossible to serve or otherwise notify OSA of the Town's Petition. Instead, counsel stated that she made no attempt to notify OSA due to "the hostility of the current situation, contrary position of Defendant representatives and the immediate need for injunctive relief." We reject this as a basis to avoid the obligation to notify OSA. First, the record contains no evidence of hostility by OSA or its members. Indeed, Lt. Gilliam described the demeanor of OSA's representatives as cordial and matter-of-fact. Additionally, in every application for a temporary restraining order there is going to be a disagreement between the parties and a need for immediate relief. These facts, standing alone, cannot justify a failure to notify the adverse party.[3]

[¶ 95] As we noted above, we are not unsympathetic to the Town's concerns or the limited time within which it had to address those concerns. The First Amendment, however, is fiercely protective of free speech rights and demands close adherence to its procedural safeguards when a government seeks to restrict those rights. In this case, the Town's efforts, while commendable in attempting to work cooperatively and courteously with OSA, fell short of the First Amendment's strict requirements.

[¶ 96] We thus hold that the district court abused its discretion in issuing the TRO without notice to OSA and an opportunity for OSA to be heard.

---

**3.** With respect to the timeframe, the record is not clear as to when Lt. Gilliam had the conversation with OSA members concerning the Boy Scout event. The lieutenant's affidavit does not specify the date, so we know only that the conversation occurred sometime between Wednesday, the 18th, and Friday, the 20th. In any event, the time period at issue in *Carroll* was less than twenty-four hours, with the restraining order and the scheduled event both occurring on the same day, and the Supreme Court was not persuaded that it was impossible to provide the required notice and opportunity to be heard.

## B. *W.R.C.P. 65(c) Bond Requirement*

[¶ 97] OSA contends the district court also erred in failing to require that the Town post a security for any damages OSA might incur as a result of the TRO. The Town responds that Rule 65(c) should be read to require a bond only if the district court finds a likelihood of harm to the defendant.

[¶ 98] We agree with the Town that under Rule 65(c), if the district court finds no likelihood of harm to the defendant, no bond is necessary. We nonetheless find error because the rule requires that the district court, in the exercise of its discretion, expressly consider whether there is a likelihood of harm and whether security must be posted, and in this case, the district court did not give consideration to these matters. *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987) (citing *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44 (7th Cir.1980); *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th ·Cir.1978); *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1145–46 (3rd Cir.1977)) (court must consider whether bond is required and make findings otherwise order is "unsupportable"); *see also Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964) (if court finds no likelihood of harm to defendant, bond is not required).

[¶ 99] It is unlikely that OSA suffered damages as a result of the twelve-hour TRO issued by the district court, and during oral argument to this Court, OSA was unable to articulate any particular damage it may have suffered. The district court was nonetheless required to make findings as to the likelihood of harm to OSA, and it abused its discretion in issuing the TRO without those required findings.

## *CONCLUSION*

[¶ 100] The district court issued a TRO that, however well-intentioned, violated the strict protections of the First Amendment and the requirements of Rule 65 of the Wyoming Rules of Civil Procedure. We therefore must reverse the decision issuing the TRO.[4]

GOLDEN, J., delivers the opinion of the Court; KITE, C.J., files a dissenting opinion in which HILL, J., joins.

KITE, Chief Justice, dissenting, in which HILL, J., joins.

[¶ 101] I write separately because I disagree with the majority's conclusion that this case is not moot because it falls within the special category of disputes that are "capable of repetition, yet evading review." Were I writing the majority opinion, I would conclude that the case is moot because no showing was made that it falls within that special category.

[¶ 102] In *Turner v. Rogers*, —— U.S. ——, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011), the Court granted a petition for writ of certiorari to consider whether a right to counsel existed in civil contempt proceedings to enforce child support orders. The respondent, mother, asserted the case was moot because the petitioner, father, had completed his sentence for contempt prior to seeking the writ. The Supreme Court concluded the case was not moot because it fell within a special category of disputes that are "capable of repetition, while evading review." *Id.* at 2509. A dispute falls into this special category, the Court stated, and remains live if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Id.*, citing *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam).

[¶ 103] Applying the first prong of this test, the Court concluded the challenged action, father's imprisonment, was in its duration too short to be fully litigated through the state courts and arrive in the United States Supreme Court before he had completed the

---

4. OSA requested that this Court remand to the district court for consideration of an award of damages. OSA did not support this request with legal authority or analysis, and we therefore decline to remand for any further proceedings.

sentence. Applying the second prong, the Court concluded there was more than a reasonable likelihood that father would again be subjected to the same action. In reaching the latter conclusion, the Court said:

[father] has frequently failed to make his child support payments. He has been the subject of several civil contempt proceedings. He has been imprisoned on several of those occasions. Within months of his release from the imprisonment here at issue he was again the subject of civil contempt proceedings. And he was again imprisoned, this time for six months. As of December 9, 2010, [father] was $13,814.72 in arrears, and another contempt hearing was scheduled for May 4, 2011. These facts bring this case squarely within the special category of cases that are not **moot** because the underlying dispute is "capable of **repetition,** yet evading **review.**

*Turner,* 131 S.Ct. at 2515.

[¶ 104] Unlike *Turner,* where the Court had before it numerous facts showing that father would again be subjected to imprisonment for civil contempt, no showing was made here that it is reasonably likely Operation Save America will again be subjected to a court order restraining it from assembling or displaying posters in Jackson. "The capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *L.A. v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983), citing *DeFunis v. Odegaard,* 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974). For there to be a "reasonable expectation" that a party will be subjected to the same action again, that event must be a "demonstrated probability." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); *Weinstein,* 423 U.S. at 149, 96 S.Ct. at 348. As the Court said in *DeFunis,* 416 U.S. at 320 n. 5, 94 S.Ct. at 1707 n. 5,

"Speculative contingencies afford no basis for our passing on the substantive issues [the petitioner] would have us decide," *Hall v. Beals,* 396 U.S. 45, 49 [90 S.Ct. 200, 24 L.Ed.2d 214] (1969), in the absence of

"evidence that this is a prospect of 'immediacy and reality.' " *Golden v. Zwickler,* 394 U.S. 103, 109 [89 S.Ct. 956, 22 L.Ed.2d 113] (1969); *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 [61 S.Ct. 510, 85 L.Ed. 826] (1941).

No evidence was presented in this case that Operation Save America will return to Jackson and attempt to assemble or display posters during another scheduled event such as the Boy Scouts expo and auction or, in the event it does, that the town will again file for a temporary restraining order without providing notice and an opportunity to be heard. The capable of repetition prong necessary for a dispute to fall within the special category of cases has not been satisfied. I would conclude, therefore, that the case is moot.